| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 17 CR 239-1 |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| JESSICA ARONG O'BRIEN AND MARIA BARTKO, | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM OPINION & ORDER

Defendants Jessica Arong O'Brien and Maria Bartko are charged with engaging in a scheme to defraud that involved causing lenders to issue and refinance loans related to two investment properties that O'Brien owned on the south side of Chicago. The indictment charges O'Brien and Bartko with mail fraud in violation of 18 U.S.C. § 1341 in Count I, and it charges O'Brien with bank fraud in violation of 18 U.S.C. § 1344 in Count II. The indictment alleges that defendants' scheme was comprised of a series of transactions in 2004, 2005, 2006, and 2007. R. 1 at 4-7. Of particular relevance here, the indictment alleges that in 2007, Citibank, N.A. ("Citibank") funded a loan[1] in the amount of $73,000 for one of the investment properties sold by O'Brien to Bartko using a straw buyer. R. 1 at 10.

---

[1] The indictment refers to this as a "mortgage loan" (R. 1 at 10), but a Citibank representative in her testimony (R. 113 at 78-79, 85, 105) and the parties in some of their filings (R. 148 at 2, 14; R. 161 at 6) refer to it as a "home equity loan." This distinction is not relevant for purposes of this opinion, but the parties should clarify the type of loan at issue at trial.

Before the Court are two motions: (1) O'Brien's motion to dismiss the indictment based on the statute of limitations and failure to state an offense (R. 139); and (2) O'Brien's motion to dismiss based on pre-indictment delay (R. 141). For the reasons explained below, the Court denies both motions.

## I.      Statute of Limitations and Failure to State an Offense

### A.      Standard

Federal Rule of Criminal Procedure 12(b)(3)(B) allows a party to raise by pretrial motion "a defect in the indictment or information, including . . . failure to state an offense." Rule 12(b)(1) more generally allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," including an argument based on the "statute of limitations." Fed. R. Crim. P. 12(b)(1) & (b)(1)-(2) advisory committee note.

Pursuant to Federal Rule of Criminal Procedure 7(c)(1), an "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The indictment need not "allege in detail the factual proof that will be relied on to support the charges." *United States v. Smith*, 230 F.3d 300, 306 (7th Cir. 2000). "An indictment is legally sufficient if it (1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that [s]he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

On a motion to dismiss, "[a]n indictment is reviewed on its face, regardless of the strength or weakness of the government's case." *Id.* This Court "assumes all facts in the indictment are true and must 'view all facts in the light most favorable to the government.'" *United States v. Segal*, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004) (quoting *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)).

## B.    Application

O'Brien moves to dismiss Count I of the indictment based on the statute of limitations and Count II for failure to state an offense. "To secure an indictment for mail . . . fraud" as alleged in Count I, "the government was required to show probable cause to believe that [O'Brien]: (i) participated in a scheme to defraud; (ii) acted with intent to defraud; and (iii) used the mail . . . in furtherance of the fraudulent scheme." *United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005). Mail fraud generally is governed by the default five-year limitations period for non-capital federal crimes set forth in 18 U.S.C. § 3282(a). But a ten-year statute of limitations applies to mail fraud that "affects a financial institution." 18 U.S.C. § 3293(2). The government relied on the ten-year statute of limitations in 18 U.S.C. § 3293(2) to indict O'Brien when it did.

A ten-year statute of limitations undisputedly applies to the bank fraud charge in Count II. *See* 18 U.S.C. § 3293(1). But like the statute providing a ten-year limitations period for mail fraud, the statute criminalizing bank fraud contains a "financial institution" requirement. To obtain an indictment for bank fraud, the government needed to establish probable cause to believe that O'Brien "knowingly

execute[d], or attempt[ed] to execute, a scheme . . . (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344.

O'Brien's arguments for dismissal focus on the "financial institution" requirement in the ten-year statute of limitations for mail fraud (18 U.S.C. § 3293(2)) and the statute setting forth the elements of bank fraud (18 U.S.C. § 1344). "Financial institution" is defined to include "an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act ['FDIA'])." 18 U.S.C. § 20. Section 3(c)(2) of the FDIA in turn provides that "[t]he term 'insured depository institution' means any bank or savings association the deposits of which are insured by the Corporation pursuant to this chapter." 12 U.S.C. § 1813(c)(2).

Although the indictment describes a number of transactions comprising the alleged scheme, it only alleges that one of them (a) involved a financial institution (Citibank) and (b) occurred within the ten-year statute of limitations: the $73,000 loan the straw buyer obtained for the purchase of one of O'Brien's two investment properties in 2007. *See* R. 1. Because this is the only loan that potentially brings this case within the ten-year statute of limitations, it is the focus of O'Brien's motion.

O'Brien claims that, in fact, CitiMortgage funded the $73,000 loan—not Citibank. And CitiMortgage undisputedly did not qualify as a "financial institution" in 2007. *See, e.g.*, *United States v. Bouchard*, 828 F.3d 116, 124 (2d Cir. 2016) (prior to the Fraud Enforcement and Recovery Act of 2009, "financial institution[s]" did not include mortgage lenders, and the pre-2009 definition applies to conduct that occurred before 2009). O'Brien therefore maintains that the default five-year statute of limitations applies to the mail fraud charge in Count I, and that statute expired well before the government indicted this case. O'Brien further maintains that Count II fails to state an offense because the $73,000 loan alleged to be the subject of bank fraud was not funded by a financial institution.

For several reasons set forth below, this Court declines to dismiss the indictment on these bases.

### 1. Face of the Indictment

As explained above, the Court's review at this stage is limited. It must "assume[ ] all facts in the indictment are true," *Segal*, 299 F. Supp. 2d at 844, and review the indictment on its face, *White*, 610 F.3d at 958.

The indictment on its face alleges that the "scheme affected a financial institution"—namely, Citibank. R. 1 at 2-3. For purposes of Count I, the indictment specifically alleges that O'Brien and Bartko knew "that false information would be submitted to lenders, including Citibank, N.A., to qualify [the straw buyer] for the [2007] loans." *Id.* at 7. For purposes of Count II, the indictment specifically alleges that O'Brien "knowingly executed and attempted to execute the scheme to defraud

by causing Citibank, N.A., a financial institution, to fund a mortgage loan in the amount of approximately $73,000" for one of the two investment properties sold in 2007. *Id.* at 10; *see also* R. 139 at 1 (O'Brien acknowledges that "[t]he Indictment *alleges* that Citibank . . . was the lender on the $73,000 loan"). The indictment also states that "Citibank N.A." was during the relevant time period a "financial institution[ ], the deposits of which were insured by the Federal Deposit Insurance Corporation." R. 1 at 2.

In other words, the indictment on its face plainly alleges that the mail fraud scheme described in Count I affected Citibank, a financial institution as defined by 18 U.S.C. § 20 and 12 U.S.C. § 1813(c)(2). Count I therefore alleges an offense affecting a financial institution governed by the ten-year statute of limitations. And the indictment on its face plainly alleges that Citibank funded the $73,000 loan described in Count II. Count II thus states the offense of defrauding a financial institution. Accordingly, the indictment is not legally insufficient.

### 2. Outside Evidence

O'Brien urges the Court to consider evidence outside the four corners of the indictment to decide her motion. *See* Ex. 139 (exhibits). O'Brien cites a Tenth Circuit case, *United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994), for the proposition that courts may consider facts outside the indictment on a motion to dismiss. But the *Hall* court made clear that as a general matter, "[c]ourts should refrain from considering evidence outside the indictment when testing its legal sufficiency." 20 F.3d at 1087. It explained that only under "certain limited

circumstances" could a district court "go beyond the allegations of the indictment and make predicate findings of fact." *Id.* at 1088. These circumstances are: "[1] where the operative facts are undisputed and [2] the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case." *Id.* "Under this scenario," the *Hall* court explained, "a pretrial dismissal is essentially a determination that, *as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." *Id.* (emphasis in original). The court emphasized "that such a scenario is not likely to recur," and it "caution[ed] both the trial courts and counsel that the procedure [t]here employed [wa]s indeed the rare exception." *Id.*

This case is not "the rare exception" described in *Hall. Id.* The facts are not "undisputed" (*id.*)—rather, the government heavily contests the facts stated by O'Brien. Nor has "the government fail[ed] to object to the district court's consideration of [outside] facts" (*id.*)—rather, the government strenuously objects to this Court's consideration of outside facts.

In any event, even if this Court were to consider facts beyond the face of the indictment, it would not change the Court's conclusion. O'Brien says the outside evidence conclusively reveals that CitiMortgage, not Citibank, funded the $73,000 loan. In fact, there is significant evidence supporting the government's position that Citibank was the lender on the $73,000 loan. The note, the mortgage, the HUD-1 settlement statement, the truth in lending disclosure, the affiliated business arrangement disclosure, and the evidence of homeowner's insurance all identify

Citibank as the lender. R. 148-1, 148-2, 148-3, 148-4, 148-5, 148-6. Moreover, at an evidentiary hearing before this Court on October 11, 2017, Judy Taylor, a Citibank vice president, testified: (1) that the "$73,000" were "Citibank funds," R. 113 at 78; (2) that "the [$73,000] home equity loan was a Citibank product," as the note and other documents demonstrated, *id.* at 105; and (3) that the loan was funded using "all Citi money," *id.* at 79. Taylor explained that although the wire transmitting the funds indicated that the funds came from a CitiMortgage account, that money would have been "requested from the Citibank cash account and transferred over to the [CitiMortgage] wholesale lending account," which "was zeroed out at the end of the day." *Id.* at 62-63, 77-79.

O'Brien points to other documents that she claims establish that CitiMortgage, and not Citibank, funded the $73,000 loan. These include a number of documents prior to closing identifying CitiMortgage or CitiMortgage and affiliates as the originator or lender (R. 139-3, 139-7, 139-9); documents from the day of closing identifying CitiMortgage as the lender and indicating that funds for the loan were drawn from a CitiMortgage account (R. 139-13, 139-14, 139-15, 139-16, 139-17, 139-18, 139-31, 139-32, 139-33); mortgage account statements from CitiMortgage and checks made out to CitiMortgage for the loan (R. 139-19, 139-20, 139-21); IRS tax records and credit reports for the alleged straw buyer identifying CitiMortgage as the lender (R. 139-27, 139-28, 139-29); and a letter from a CitiMortgage representative in response to a government subpoena stating that CitiMortgage took a loss of $73,000 on the loan (R. 139-23).

O'Brien acknowledges, however, that the note and the mortgage executed at closing identified Citibank as the lender for the $73,000 loan. R. 139 at 7. She concedes that "[s]ome of the underwriting approval paperwork did . . . reflect that Citibank would be the lender on the $73,000." R. 139 at 5. In light of this evidence and the other documents and testimony cited by the government, the issue of which entity funded the $73,000 loan is far from one that can be decided as a matter of law. Indeed, whereas O'Brien's motion claims to have affirmative proof that "in fact CitiMortgage **did** fund the $73,000 loan" (R. 139 at 20 (emphasis in original)), her supplemental and reply briefs implicitly acknowledge that the issue is not so clear cut by focusing on the *lack* of definitive proof as to which entity funded the loan. *See* R. 145 at 2 (supplemental brief discussing lack of "unequivocal[ ]" proof and "dispositive documentary evidence"); R. 161 at 6, 9 (reply brief discussing lack of "direct evidence" and "dispositive evidence").

O'Brien argues in her supplemental brief that pursuant to Citigroup's ten-year retention policy for certain records (R. 145-2, 145-3), documents may have been destroyed that would conclusively "evidenc[e] Citibank funding [the] $73,000 loan" or show "that CitiMortgage . . . funded the loan." R. 145 at 2. O'Brien criticizes the government for failing to "issue[ ] a simple litigation/legal/regulatory hold" during its investigation to prevent the destruction of this evidence. R. 145 at 2.

O'Brien points to no criminal case dismissing an indictment or otherwise sanctioning the government (as O'Brien suggests, R. 145 at 8) based on failure to

ensure that a litigation hold is put into place.[2] And, as O'Brien acknowledges, there is "nothing unlawful or improper" about a records retention policy. R. 141 at 12 (citing *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704 (2005)). The fact that that certain documents may no longer exist due to the routine and lawful records retention policy of one of the alleged victims in this case does not mean that all other evidence should be ignored and O'Brien is entitled to judgment as "*as a matter of law.*" *Hall*, 20 F.3d at 1088 (emphasis in original).[3]

Rather, as this Court explained at the October 11, 2017 evidentiary hearing, any missing documentation is

> a matter of proof that the government is going to have to overcome at trial. They may have to call [Taylor] as a witness at trial. But they have established a good-faith basis to at least at this stage establish that the money comes from a financial institution. . . . If you want to impeach . . . with the absence of records, that's a matter for trial proof.

R. 113 at 80. Indeed, weighing competing documentary evidence and determining the appropriate weight to give to Taylor's testimony (as well as any other Citibank representatives' testimony) are quintessential tasks for the jury.

---

[2]     Litigation holds typically refer to an internal order an organization puts in place to "hold" and not destroy certain documents that otherwise would be destroyed pursuant to a routine document destruction policy. The government typically does not put a "litigation hold" in place—rather, the holder of the documents puts such a hold in place. The government's method of preventing document destruction is to issue a grand jury subpoena, which obligates the subpoenaed organization to take steps to retain and ultimately produce the subpoenaed documents. Here, as further discussed below, the government issued a grand jury subpoena seeking relevant documents from the Citi entities very early in its investigation.

[3]     O'Brien's claims of prejudice resulting from missing documents are best addressed in the context of her motion to dismiss based on pre-indictment delay, which the Court addresses below.

In sum, even if the Court were to consider facts beyond the face of the indictment—which governing law says it cannot do in these circumstances—it still would find that O'Brien's motion presents jury issues that cannot be decided on a motion to dismiss.

### 3. Risk of Loss to Parent Company Sufficient for Count I

There is an additional reason why O'Brien's motion does not provide grounds for dismissal of Count I. Several courts of appeals have interpreted 18 U.S.C. § 3293(2)'s ten-year statute of limitations for wire or mail fraud "affect[ing] a financial institution" to encompass situations where a financial institution's subsidiary funded a loan. *See, e.g.*, *United States v. Mullins*, 613 F.3d 1273, 1278-80 (10th Cir. 2010); *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998); *United States v. Pelullo*, 964 F.2d 193, 214-16 (3d Cir. 1992). Under this interpretation, even if O'Brien is correct that CitiMortgage (Citibank's subsidiary) funded the $73,000 loan, the ten-year statute of limitations still would apply, and Count I would not be time-barred.

O'Brien maintains that the Seventh Circuit's decades-old decision in *United States v. White*, 882 F.2d 250 (7th Cir. 1989), indicates that the Seventh Circuit would take a different position than these other courts of appeals. This Court disagrees. *White* did not address the proper interpretation of the "affects a financial institution" language in 18 U.S.C. § 3293(2). Rather, it involved a challenge to a conviction under 18 U.S.C. § 1014, which prohibits "'knowingly'" making false statements "'for the purpose of influencing'" an FDIC-insured institution. *White*, 882

F.2d at 250 (quoting 18 U.S.C. § 1014). The Seventh Circuit in *White* held that 18 U.S.C. § 1014 did not extend to statements made to a wholly owned bank subsidiary, explaining that it could not assume "that Congress wanted to extend the statute's protection to [the bank's] affiliates, when so far as appears there is no (or only the most attenuated) federal stake in preventing fraud against affiliates of a federally insured bank." *Id.* at 253.

The Seventh Circuit has since distinguished *White* as a case where the indictment did not charge the defendant with an element of the crime—intent to influence a financial institution. *See United States v. Bianucci*, 416 F.3d 651, 656 (7th Cir. 2005). Rather, the indictment in *White* charged the defendant only with intent to influence a financial institution's subsidiary. *Id.* In *Bianucci*, on the other hand, the indictment charged the defendant "with making false statements [in documents submitted to a subsidiary] for the purpose of influencing the [financial institution] to advance funds to [the subsidiary]." *Id.* at 657. And "there [wa]s sufficient evidence to show that [the defendant] knew the bank was identified as the lender, and that, although [the subsidiary] may have been servicing the loan, the bank was advancing the money." *Id.* Unlike in *White*, the government in *Bianucci* "did not stake its case on proving that [the subsidiary] was an FDIC-insured entity." *Id.*

Like in *Bianucci* and unlike in *White*, the indictment in this case alleges all of the required elements of mail fraud affecting a financial institution—including facts that would support that the mail fraud affected Citibank, which the indictment

12

alleges owned Citibank Domestic Investment Corp., which in turn owned CitiMortgage. R. 1 at 2. The government has not "stake[d] its case on proving that [CitiMortgage] was an FDIC-insured entity." *See Bianucci*, 416 F.3d at 647.

Moreover, knowingly making statements for the purpose of influencing a financial institution under 18 U.S.C. § 1014 is a substantively different requirement than affecting a financial institution under 18 U.S.C. § 3293(2). *Cf. Pelullo*, 964 F.2d at 216 (emphasizing that 18 U.S.C. § 3293(2) does not "provid[e] for an extended limitations period where the financial institution is the *object* of fraud"; rather, through the word "affected," "Congress chose to extend the statute of limitations to a broader class of crimes"). And more recent Seventh Circuit decisions than *White* indicate that it would follow its sister circuits in the context of interpreting 18 U.S.C. § 3293(2). For example, the Seventh Circuit in *United States v. Serpico*, 320 F.3d 691 (7th Cir. 2003), determined that a district court properly instructed the jury that an offense affects a financial institution for purposes of 18 U.S.C. § 3293(2) if it "expose[s] the financial institution[s] to a new or increased risk of loss. A financial institution need not have actually suffered a loss in order to have been affected by the scheme." *Id.* at 694. The court explained that "protection for financial institutions is much more effective if there's a cost to putting those institutions at risk, whether or not there is actual harm." *Id.* at 694-95. Relying on *Serpico*, the Seventh Circuit in *United States v. Marr*, 760 F.3d 733 (7th Cir. 2014), rejected a challenge to a jury instruction stating that "[a] scheme 'affected' a

financial institution if it exposed the financial institution to a new or increased risk of loss." *Id.* at 743-44.

The Tenth Circuit in *Mullins* applied the same definition of "affected" adopted by the Seventh Circuit in *Serpico* and *Marr* to conclude that the ten-year statute of limitations applies even when a mortgage company subsidiary issued a loan, as long as the jury finds that the loan exposed the parent financial institution to a greater risk of loss. 613 F.3d at 1278-80. The *Mullins* court first determined that "a 'new or increased risk of loss' is plainly a material, detrimental effect on a financial institution, and falls squarely within the proper scope of [18 U.S.C. § 3293(2)]." *Id.* at 1278-79. Applying that interpretation, the court found that the jury reasonably could have concluded that "the loans [the subsidiaries] issued based on false information [defendant] helped supply exposed the companies to a greater risk of loss," and "that this risk of loss passed through to their parent financial institutions." *Id.* at 1280; *accord Pelullo*, 964 F.2d at 215 ("assum[ing] that a fraud perpetrated against a financial institution's wholly owned subsidiary cannot affect the parent" is "a clearly untenable assumption"). This Court sees no reason to believe that the Seventh Circuit would conclude differently in light of its identical interpretation of "affected" for purposes of 18 U.S.C. § 3293(2).

Thus, even if the jury agrees with O'Brien that CitiMortgage funded the $73,000 loan, that would not end the jury's inquiry as to Count I. The jury still could find, as the jury did in *Mullins*, that "the ten year statute of limitations applies" to Count I, 613 F.3d at 1280, because the false information O'Brien helped

supply "exposed [CitiMortgage's parent Citibank] to a new or increased risk of loss." *See Serpico*, 320 F.3d at 694. Such a finding could be supported by Taylor's testimony that "if, in fact, there was a loss" from the $73,000 loan, "Citibank" "would take that loss." R. 113 at 82; *see also, e.g.*, *Bouyea*, 152 F.3d at 195 (testimony by subsidiary's representative that parent financial institution "was affected by th[e] loss" "was sufficient to support the finding that a financial institution was affected by the wire fraud"); *Mullins*, 613 F.3d at 1280 (based on "the mechanisms the companies' officers described," the jury reasonably found that the "risk of loss passed through to the[ ] parent financial institutions, which would bear any loss the mortgage companies incurred"). This is another reason why the Court declines to dismiss Count I based on the statute of limitations.

## II.    Pre-Indictment Delay

### A.    Standard

Under Federal Rule of Criminal Procedure 48(b)(1), a district court may dismiss an indictment "if unnecessary delay occurs in . . . presenting a charge to a grand jury." "A defendant's primary safeguard against unreasonable prosecutorial delay is derived from the applicable statute of limitations." *United States v. McMutuary*, 217 F.3d 477, 481 (7th Cir. 2000). The "Fifth Amendment's due process clause plays a limited," additional "role in assuring that the government does not subject a defendant to oppressive delay." *United States v. Spears*, 159 F.3d 1081, 1084 (7th Cir. 1998).

To establish a due process violation based on pre-indictment delay, a defendant "must demonstrate that the delay caused actual and substantial prejudice to his right to a fair trial." *McMutuary*, 217 F.3d at 482. "A defendant's burden to show actual and substantial prejudice is an exacting one; the showing must rest upon more than mere speculative harm." *Id.* "The defendant's allegations . . . must be 'specific, concrete, and supported by evidence.'" *Id.* (quoting *United States v. Sowa*, 34 F.3d 447, 450 (7th Cir. 1994)). The Seventh Circuit has described this as a "monumental hurdle." *Sowa*, 34 F.3d at 451.

If the defendant succeeds in demonstrating actual and substantial prejudice, "the burden shifts to the government to 'show that the purpose of the delay was not to gain a tactical advantage over the defendant or for some other impermissible reason.'" *McMutuary*, 217 F.3d at 482 (quoting *Spears*, 159 F.3d at 1084-85). The government's "reasons are then balanced against the defendant's prejudice to determine whether the defendant has been denied due process." *Sowa*, 34 F.3d at 451. To constitute a due process violation, the "actual prejudice to the defendant . . . must be so substantial as to outweigh the preferable deference to legitimate prosecutorial priorities and bureaucratic realities." *United States v. Williams*, 738 F.2d 172, 175 n.2 (7th Cir. 1984).

### B.    Application

#### 1.    Actual and Substantial Prejudice

O'Brien's argument for actual and substantial prejudice is founded on the potentially relevant documents no longer available in light of Citigroup's ten-year

records retention policy. O'Brien explains that the government's investigation in this case began at some point in 2015, at least a year and a half before Citigroup's records retention policy (or, more accurately, document destruction policy) kicked in for certain documents from April 2007 that may have been related to the $73,000 loan. O'Brien acknowledges that "one of the first things [the government] did" in its investigation was to issue a grand jury subpoena to CitiMortgage "request[ing] information regarding the loss" on the $73,000 loan. R. 166 at 7. Through that subpoena, "the Government [also] asked for documents tracking the elements required to prove a mail or wire fraud case." *Id.* As explained above, a grand jury subpoena of this nature is the government's primary method of preventing document destruction.

O'Brien nevertheless claims the government did not do enough to ensure the preservation of relevant records by the Citi entities in this case. O'Brien emphasizes that in response to the grand jury subpoena, a CitiMortgage representative sent a letter to the government in September 2015 explaining that it was producing non-privileged, responsive documents, and stating that "[t]he loan[ ] . . . result[ed] in a loss to CitiMortgage of . . . $73,000." R. 141-8. At that point, O'Brien maintains, the government was on notice that CitiMortgage may have been the lender on the $73,000 loan. O'Brien says the government should have realized that CitiMortgage was not a financial institution and taken additional steps beyond the grand jury subpoena to ensure that no records potentially relevant to that issue would be destroyed.

O'Brien points out that if the government had indicted the case several months sooner than it did (in mid-April 2017), O'Brien could have sought any relevant documents from April 2007 before Citigroup's retention policy came into play. Because she claims these records could conclusively establish that CitiMortgage—not Citibank—funded the $73,000 loan, which would support the arguments addressed in Section I of this opinion, O'Brien says that the delay caused actual and substantial prejudice.

Although the Court agrees with O'Brien that the timing of the expiration of Citigroup's ten-year records retention policy vis-à-vis the indictment is unfortunate, the Court finds that O'Brien has not satisfied the "monumental hurdle of proving prejudice" based on pre-indictment delay. *Sowa*, 34 F.3d at 451. Again, "[a] defendant's burden to show actual and substantial prejudice is an exacting one," requiring O'Brien to be "concrete" and "specific." *McMutuary*, 217 F.3d at 482. "[A] pre-indictment delay which causes evidence to be unavailable will not alone amount to actual prejudice." *Spears*, 159 F.3d at 1085. To satisfy her burden based on records "destroy[ed]" "in the regular course of . . . business," O'Brien must show "whose records would have been subpoenaed, what those records are likely to have shown, and how the records would have been helpful to the defense." *United States v. Canoy*, 38 F.3d 893, 902-03 (7th Cir. 1994).

O'Brien has not identified particular documents likely destroyed pursuant to Citigroup's records retention policy that are likely to have shown CitiMortgage to be the lender on the $73,000 loan and thus to help her defense. The specific documents

O'Brien complains are missing—and that appear to fall under the terms of the ten-year records retention policy (*see* R. 145-2)—are the "cash transaction reports, as well as due to and due from reconciliation of funds transfer documents" that were "*testified to by Ms. Taylor.*" R. 145 at 4 (emphasis added). In other words, what O'Brien claims to be missing are reconciliation documents supporting Taylor's testimony that although the wire transfer documents show that the funds for the $73,000 loan came from a CitiMortgage account, that money in fact would have been "requested from the Citibank cash account and transferred over to the [CitiMortgage] wholesale lending account," which "was zeroed out at the end of the day." R. 113 at 62-63; *see also* R. 166 at 5 (in describing the "specific and concrete documents that . . . should have existed in 2015 when the Government began its investigation" in her reply brief, O'Brien states that "[t]hese documents—evidence of *Citibank's* alleged funding of the $73,000 loan—no longer exist") (emphasis added). Again, to meet her burden, O'Brien had to show "how the records [missing] would have been helpful *to the defense.*" *See Canoy*, 38 F.3d at 902-03 (emphasis added) (explaining that defendant needed to show how missing "records would have implicated another individual").

O'Brien's more general, optimistic assertions that missing documents could prove once and for all that CitiMortgage was the lender on the $73,000 loan are "speculative" rather than "concrete" and "specific." *McMutuary*, 217 F.3d at 482.[4]

---

[4]     Importantly, the ten-year records retention policy did not result in the destruction of wire transfer and accounting records for the $73,000 loan. Although the Citi entities originally believed that "they no longer ha[d] copies of the wire

Although it is possible that missing documents would provide impeachment of Taylor, that possibility is unlikely in light of Taylor's clear, detailed testimony and key documentary evidence—including the note and the mortgage—corroborating that testimony and identifying Citibank as the lender for the $73,000 loan. In light of this evidence and testimony, it seems "likely" that any missing documents would support the government's case rather than O'Brien's. *See Canoy*, 38 F.3d at 902.

More broadly, as detailed above, there is substantial documentary and testimonial evidence regarding who funded the $73,000 loan for the jury to weigh at trial. This is not a case in which delay has resulted in a gaping dearth of evidence relevant to a key issue. For these reasons, the Court finds that O'Brien has not met the "exacting" standard of providing "concrete evidence showing material harm" to her case as a result of pre-indictment delay. *Id.* (quotation marks omitted).

---

transfers related to the April 16, 2007 closing because such records ha[d] aged out of [the] ten-year document retention policy," R. 141-13, a further search revealed that this was not the case. As counsel for CitiMortgage and Citibank explained to O'Brien's counsel in a December 13, 2017 letter:

> Yesterday, the Citi Entities confirmed that, although the wire transfer records were marked for destruction pursuant to the document retention policy, the hard copy records had not yet been destroyed and were being held at an off-site facility. Copies of those documents are being produced herewith. . . . In addition, the Citi Entities have confirmed that accounting records related to the transactions on April 16, 2007 were produced by the Citi Entities along with the origination files and other documents. . . . The Citi Entities will identify a witness who can testify . . . regarding the matters set forth in this letter.

R. 139-34. Thus, the delay has not deprived O'Brien of wire transfer records and other accounting records for the $73,000 loan. It also has not deprived O'Brien of testimony from the Citi entities' representatives related to those records.

### 2. Government's Explanation

Even if O'Brien had satisfied her burden, the Court would reach the same conclusion under the second prong of the due process inquiry based on the facts as they currently stand. Like in *McMutuary*, the Court finds that the government has "offered a credible explanation for the delayed filing of the indictment" that is not "outweighed by the prejudice claimed by" O'Brien. 217 F.3d at 482. The government explains that it initiated a grand jury investigation on or about the day after investigating agencies opened the mortgage fraud investigation underlying this case. The government represents that it then engaged in an efficient, ongoing grand jury investigation between August 2015 and the indictment in April 2017, which is (according to the government) a typical duration for a case of this nature. The government notes that during this time, it "met with defendant's counsel, provided defendant's counsel with a 'reverse proffer,' and gave defendant's counsel key documents as pre-charging discovery." R. 154 at 6 n.3; *see, e.g., Canoy*, 38 F.3d at 903 (crediting government explanation "that the delay resulted from its investigatory process, grand jury proceedings, an exchange between the parties of discovery materials, and then by lengthy pre-indictment plea negotiations").

This is a far cry from the situation in *United States v. Sabath*, 990 F. Supp. 1007 (N.D. Ill. 1998), on which O'Brien relies. In *Sabath*, there was a "four-year-and-two-month delay" prior to the return of the indictment during which the government failed to "demonstrate any legitimate investigative activity," and that delay created "severe, actual prejudice" to the defendant in the form of three

witnesses dying whose "testimony could well have been outcome-determinative." *Id.* at 1014-16; *see also id.* at 1008 (describing *Sabath* as a "highly unusual criminal case" in which "the government recklessly delayed in bringing highly circumstantial arson and related mail fraud charges against Defendant until . . . 1997—even though by the government's own admission the investigation was completed over four years earlier"). Here, unlike in *Sabath*, the government did not wait for years after completing its investigation to indict.

Nor has there been any showing that the investigatory "explanation offered by the government was pretextual." *McMutuary*, 217 F.3d at 482. To the contrary, the government's good faith is shown by the fact that, on the first day of its investigation, it issued a grand jury subpoena to CitiMortgage seeking "documentation of any loss realized (and the calculations of those losses) by CitiMortgage or Citibank on the [2007] mortgage loans as a result of foreclosure or short sale" and "documentation of the writing of loan proceeds." R. 154 at 12. O'Brien acknowledges that "one of the first things [the government] did was to request information regarding the loss," and that through its subpoena to CitiMortgage, "the Government asked for documents tracking the elements required to prove a mail or wire fraud case." R. 166 at 7. Given that the government sought key documents from CitiMortgage on the first day of its investigation, it is difficult to see how the government could have been trying to take advantage of the ten-year records retention policy or gain other tactical advantages through delay.

There is another important piece of the equation that the parties fail to address. The primary reason the government indicted this case just before the expiration of the ten-year statute of limitations and the expiration of the ten-year records retention policy was the significant delay between when the events in the indictment took place and when the government learned about them. That delay cannot be attributed to the government. *See, e.g.*, *Aleman v. Honorable Judges of Circuit Court of Cook County*, 138 F.3d 302, 310 (7th Cir. 1998) (in the context of addressing a pre-indictment delay argument in a habeas petition, finding the "position of criticizing the State for not discovering" the crime "sooner" to be "odd and untenable"). This is not a case where the defendant was "arrested . . . but [wa]s not charged" until significantly later. *See United States v. Hunter*, 197 F.3d 862, 866 (7th Cir. 1999). Nor, as explained above, is it a case of unnecessary delay after "the government possessed all of the information necessary to support an indictment." *See United States v. Miner*, 127 F.3d 610, 615 (7th Cir. 1997); *see also Sabath*, 990 F. Supp. at 1008.

With respect to the only delay that can be attributed to the government—the time between when the government began investigating and when it indicted O'Brien—as in *McMutuary*, the Court has no reason to believe that "[t]he cause of th[at] delay" was anything other than "investigatory in nature." 217 F.3d at 483. In such cases, there is no due process violation. *Id.*; *accord Sowa*, 34 F.3d at 451 ("if the cause of the delay is legitimately investigative in nature, a court will not find a due process violation").

## Conclusion

For the reasons explained above, the Court denies: (1) O'Brien's motion to dismiss based on the statute of limitations and failure to state an offense (R. 139); and (2) O'Brien's motion to dismiss based on pre-indictment delay (R. 141).[5]

ENTERED:

*Thomas M. Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: January 29, 2018

---

[5] The Court notes that O'Brien can always re-raise her pre-indictment delay argument in the event that "[e]vents of the trial . . . demonstrate actual prejudice." *See United States v. Marion*, 404 U.S. 307, 326 (1971). And O'Brien is of course free to make her arguments based on the "financial institution" requirement in the ten-year statute of limitations for mail fraud (18 U.S.C. § 3293(2)) and the bank fraud statute (18 U.S.C. § 1344) to the jury.