UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 17 CR 239-1 |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| JESSICA ARONG O'BRIEN, | ) | |
| | ) | |
| *Defendant.* | ) | |

MEMORANDUM OPINION & ORDER

A jury convicted defendant Jessica Arong O'Brien of mail fraud affecting a financial institution in violation of 18 U.S.C. § 1341 (Count I) and bank fraud in violation of 18 U.S.C. § 1344 (Count II). Before the Court are O'Brien's consolidated post-trial motions for a judgment of acquittal or, alternatively, for a new trial [277].[1] Also before the Court are several motions made by O'Brien during trial that the Court took under advisement: O'Brien's motion for judgment of acquittal filed at the close of the government's case [225], and O'Brien's oral motions for a directed verdict at the close of the evidence and following the jury charge (*see* R. 230). For the reasons explained below, the Court denies O'Brien's motions.

---

[1]    O'Brien filed over 100 pages of briefing on her post-trial motions, much of which repeats arguments already dealt with in the Court's opinions on O'Brien's five pre-trial motions to dismiss and to strike (R. 45; R. 131; R. 139; R. 141; R. 214). The Court nevertheless addresses those arguments again here.

## I.   Motion for Judgment of Acquittal

### A.   Standard

Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." "In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren,* 593 F.3d 540, 546 (7th Cir. 2010). The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "must convince [the court] that even after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found h[er] guilty beyond a reasonable doubt.'" *Warren,* 593 F.3d at 546. In other words, a court will "set aside a jury's guilty verdict only if the record contains no evidence, regardless of how it is weighed, from which a jury could have returned a conviction." *United States v. Presbitero,* 569 F.3d 691, 704 (7th Cir. 2009).

Thus, under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur,* 582 F.3d 713, 717 (7th Cir. 2009). This strict standard is a recognition that "[s]orting the facts and inferences is a task for the jury." *Warren,* 593 F.3d at 547. At the same time, "[a] Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013). "[W]here the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily

fails to establish guilt beyond a reasonable doubt." *United States v. Harris*, 942 F.2d 1125, 1129-30 (7th Cir. 1991).

### B.     Application[2]

O'Brien's motion for judgment of acquittal makes numerous arguments. To begin, she challenges two aspects of the "scheme to defraud" element of both Counts I and II: (1) the sufficiency of the evidence to support the jury's finding of a scheme, and (2) whether the scheme alleged in the indictment materially and prejudicially varied from the scheme proven at trial. O'Brien also makes two arguments related to the "affect[ing] a financial institution" element that the government needed to prove in order for Count I (mail fraud) to fall within the ten-year statute of limitations under 18 U.S.C. § 3293(2) and therefore be timely: (1) she challenges the sufficiency of the government's proof that the scheme affected a financial institution; and (2) she challenges whether "affect[ing] a financial institution" is unconstitutionally vague. Finally, O'Brien maintains that the evidence on Count II (bank fraud) was insufficient to show intent on the part of O'Brien or that O'Brien caused the execution for which the jury convicted her.

### 1.     "Scheme to Defraud" Element Of Both Counts

#### a.     Sufficiency Of The Evidence

O'Brien first argues that the Court should acquit her on both counts because no rational jury could have concluded that she engaged in a scheme to defraud—an

---

[2]     O'Brien's newly retained counsel asks the Court to "keep in mind" when deciding the motion for acquittal what he characterizes as numerous errors on the part of O'Brien's trial counsel. R. 277 at 6 n.5. As O'Brien's new counsel recognizes, however, "now is not the time to raise an ineffective assistance claim." *Id.*

element of both mail fraud under 18 U.S.C. § 1341 and bank fraud under 18 U.S.C. § 1344. "As its ordinary meaning suggests, the term 'scheme to defraud' describes a broad range of conduct." *United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992). A scheme is generally understood to be a "'continuing course of conduct, during a discrete period of time.'" *United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006) (quoting *United States v. Berardi*, 675 F.2d 894, 898 (7th Cir. 1982)).

O'Brien's argument on this issue largely rehashes points made in her pre-trial motion to dismiss the indictment on duplicity grounds. In its ruling denying that motion, this Court explained in detail why the conduct alleged in the indictment constituted a scheme. R. 116. The Court assumes general familiarity with that opinion but reiterates key points here, along with the relevant background.

The indictment against O'Brien and her co-defendant Maria Bartko (who pleaded guilty prior to trial (*see* R. 197, 205)), alleged a scheme comprised of four sets of transactions: (1) in 2004, O'Brien "fraudulently obtained mortgage loan proceeds to purchase an investment property located at 625 West 46th Street" in Chicago, Illinois ("the 46th Street property") by submitting mortgage documents with false statements regarding her income and liabilities ("the 2004 transactions"); (2) in 2005, O'Brien, with Bartko as the loan originator, "fraudulently refinanced her mortgage loans on the 46th Street property and on a second investment property located at 823 West 54th Street," also in Chicago, Illinois ("the 54th Street property") by submitting applications with false statements regarding O'Brien's

4

income and employment ("the 2005 transactions"); (3) in 2006, O'Brien "fraudulently obtained a commercial line of credit" by submitting an application with false statements about her realty company's revenue and profit "and used those loan proceeds to maintain the 46th Street and 54th Street properties" ("the 2006 transactions"); and (4) in 2007, O'Brien and Bartko "agreed that O'Brien would sell the 46th Street and 54th Street properties to Bartko" using "a straw buyer whom O'Brien and Bartko knew would be fraudulently qualified for mortgage loans" ("the 2007 transactions"). R. 1 at 4-7.

In its order denying O'Brien's motion to dismiss on duplicity grounds, the Court found that "the common elements between the transactions alleged [in the indictment] [we]re: (1) they all involved at least one of a pair of investment properties in Chicago's south side; (2) they all involved O'Brien; (3) they all involved lies in loan documents; (4) they all involved the same class of victims (lenders); and (5) they all involved the same goals (obtaining financing related to the two investment properties and personal enrichment)." R. 116 at 9-10. Additionally, all the transactions occurred over a period of time (three years) that courts have found sufficiently discrete to be part of a single scheme. *Id.* at 17-18.

At trial, the Court instructed the jury that the government had to prove "a scheme to defraud" beyond a reasonable doubt with respect to each count. R. 229 at 21-22. Consistent with this Court's holdings on the duplicity motion, the government described the scheme at closing as follows: "From 2004 to 2007, the scheme was to get money from lenders through lies and concealment, all related to

those two investment properties." Tr. 1196.[3] The government explained that O'Brien was at the "center of this scheme to defraud." Tr. 1197. The jury convicted O'Brien, thus finding the scheme element satisfied beyond a reasonable doubt.

Substantial evidence supported the jury's conclusion, including:

- Evidence that in 2004, O'Brien reported an inaccurate income and concealed her biggest liability in a loan application to purchase the 46th Street property. *E.g.*, Government Exhibit ("GX") 46th St. Purchase 2 (O'Brien's 2004 loan application claiming $6,800/month in gross income and failing to disclose liability for O'Brien and her husband's South Park property); GX ILCOMP 2 (O'Brien reported only $11,500 in wages for 2004); *see* Tr. 215-28 (testimony of Angela Miller from the Illinois Department of Revenue explaining that O'Brien was on unpaid leave from her job at the Department of Revenue from November 2003 until October 2004); GX South Park 2 (April 2004 mortgage listing O'Brien and her husband as borrowers on South Park property); GX 46th St. Refinance 2 (showing O'Brien owed over $249,000 on loan for South Park property as of 2005).

- Evidence that in 2005, O'Brien represented her income from her realty company ("O'Brien Realty") inaccurately on loan applications to earn more than $100,000 in cash out refinances on her loans on the 46th Street and 54th Street properties, with Maria Bartko as the loan interviewer. *E.g.*, GX 46th St. Refinance 2 (2005 loan application for 46th Street refinance claiming $20,000 in base monthly employment income from O'Brien Realty; showing Maria Bartko as interviewer); GX 54th St. Refinance 2 (2005 loan application for 54th Street refinance claiming $20,000 in base monthly employment income from O'Brien Realty; showing Maria Bartko as interviewer); GX Tax 3 (2005 Form 1040X showing $21,000 in gross yearly receipts for O'Brien Realty); GX 46th St. Refinance 1 (showing $32,7000 cash going to O'Brien as borrower); GX 54th St. Refinance 1 (showing $67,900 cash going to O'Brien as borrower).

- Evidence that in 2006, O'Brien misrepresented O'Brien Realty's revenue, profits, and liabilities to obtain a commercial line of credit and commercial loan used to pay mortgages and expenses for the 46th Street and 54th Street properties. *E.g.*, GX Chase 5 (O'Brien claiming $150,000 in 2005 annual sales for O'Brien Realty); GX Chase 6 (O'Brien claiming $100,000 in 2005 profits for O'Brien Realty); GX Tax 3 (2005 Form 1040X reflecting $21,000 in gross

---

[3]    "Tr." refers to the consecutively-paginated trial transcript, the eight volumes of which are available on the docket at R. 255-62.

receipts for O'Brien Realty); GX Summary 5 (showing advances on the 2006 line of credit used to make mortgage payments on the 46th Street and 54th Street properties); GX O'Brien 39 (O'Brien's bank records reflecting advances on the 2006 line of credit, with a handwritten circle around numerous advances and with the following handwritten note appearing to be a description of all the circled advances: "823 W. 54th Street rehab – labor").

- Evidence that in 2007, O'Brien purported to sell the 46th Street and 54th Street properties to a straw buyer named Christopher Kwan, when Bartko was the true buyer, and O'Brien paid Bartko money to buy them. *E.g.*, GX Acknowledgment 1 & 2 (notarized documents titled "Acknowledgment & Agreements Between Christopher Kwan/Maria Bartko ('Buyers') and Jessica O'Brien ('Seller')," which indicate O'Brien's knowledge of Bartko as a buyer ("the acknowledgments")); GX 46th St. Sale 17 ($36,000 check from O'Brien to Bartko with 46th Street address handwritten on top, dated the day before the closing and posting seven days after closing); GX 54th St. Sale 9 ($4,000 check dated the day of the 46th Street closing from O'Brien to Kwan, which Kwan endorsed over to Bartko); GX 46th St. Sale 1 (HUD-1[4] identifying Kwan as the buyer for 46th Street property and not acknowledging Bartko as a buyer or any payment to Bartko); GX 54th St. Sale 8 ($37,836 check from O'Brien to Bartko with 54th Street address handwritten on top, dated the day before the closing and posting six days after closing); GX 54th St. Sale 1 (HUD 1 identifying Kwan as the buyer for 54th Street property and not acknowledging Bartko as a buyer or any payment to Bartko); GX CCRD 1 and 2 (Kwan's quit claim deeds transferring properties to Bartko soon after closing). O'Brien obtained over $200,000 in proceeds from these closings. *See* GX 46th St. Sale 1 (over $57,000 in cash to O'Brien as seller of 46th Street property); GX 54th St. Sale 1 (over $165,000 in cash to O'Brien as seller of 54th Street property).

A rational juror easily could have found based on this evidence that between 2004 and 2007, O'Brien engaged in a scheme to defraud lenders through lies in loan documents, all related to her two investment properties. The evidence supported that O'Brien submitted false loan documents to purchase the properties, to

---

[4] "A HUD-1 form is a Housing and Urban Development settlement form used in closing a property sale that details the costs and fees associated with a mortgage loan." *United States v. Bouchard*, 828 F.3d 116, 121 n.2 (2d Cir. 2016).

refinance the properties, to obtain a commercial line of credit in part to cover expenses for the properties, and to sell the properties.

O'Brien's motion for acquittal does not argue that the government failed to present evidence of the alleged scheme. Instead, she makes a series of arguments about why the evidence presented did not constitute a scheme as a matter of law, or why additional evidence was necessary to establish a scheme as a matter of law, most of which the Court already addressed and rejected in deciding O'Brien's duplicity motion. O'Brien also makes arguments regarding the 2007 transactions that improperly ask the Court to "reassess the weight of the evidence." *Arthur,* 582 F.3d at 717.

*First*, O'Brien emphasizes that the four transactions "were separated in time; involved different kinds of alleged false statements; involved different types of transactions; and involved different lenders." R. 277 at 13. But the evidence at trial on these issues tracked the conduct alleged in the indictment. And the Court already found that the indictment alleged a scheme despite these differences. R. 116 at 9-17.

*Second*, O'Brien says there could be no scheme without evidence that O'Brien "intended, planned, or . . . foresaw the subsequent transactions when she purchased the 46th Street property in August 2004." R. 277 at 13; *see also* R. 288 at 10. As the Court explained in ruling on O'Brien's duplicity motion, however, the fact "'that the whole scheme was not planned out in advance'" is not "'significant'" in determining whether a scheme existed—a scheme can be an "'imperfectly conceived plan to

8

defraud which becomes more and more sophisticated'" over time. R. 116 at 17 (quoting *Owens v. United States*, 221 F.2d 351, 354 (5th Cir. 1995)).

*Third*, O'Brien argues that her presence in each of the transactions alone is not enough to establish a scheme, citing *United States v. Mealy*, 851 F.2d 890, 896 (7th Cir. 1988). R. 277 at 17-18. For starters, *Mealy* addressed the standard for a "wheel conspiracy." 851 F.2d at 896. It did not address what constitutes a scheme. A scheme can be "unified by the presence of the defendant . . . in each alleged act of fraud." *United States v. Brown*, 894 F. Supp. 1150, 1155 (N.D. Ill. 1995) (finding "the conspiracy cases cited by defendants," including a case addressing the standard for a wheel conspiracy, "inapplicable to the government's instant allegation of a common scheme of bank fraud"). Moreover, as described above and as the Court found in its duplicity ruling (R. 116 at 9-17), O'Brien's presence was far from the only factor uniting the transactions.

*Fourth*, O'Brien maintains that "[t]he government's decision not to call Bartko to testify as to any of the transactions . . . precluded the jury from finding she had any role in any part of the alleged scheme." R. 277 at 14; *see also* R. 288 at 6. But the government was not required to introduce certain types of evidence— namely, Bartko's testimony—to establish that Bartko played a role in the scheme. The government introduced significant documentary evidence showing Bartko's role, including: (1) the 2005 loan applications identifying Bartko as the "interviewer" (GX 46th St. Refinance 2; GX 54th St. Refinance 2); (2) the two checks for more than $70,000 from O'Brien to Bartko listing the two property addresses on

9

them and dated the day before the 2007 closings (GX 46th St Sale 17; GX 54th St. Sale 8); (3) the $4,000 check dated the day of the 2007 closings from O'Brien to Kwan, which Kwan endorsed over to Bartko (GX 54th St. Sale 9); (4) the acknowledgments identifying Bartko as a buyer (GX Acknowledgments 1 and 2); and (5) Kwan's quit claim deeds transferring the properties to Bartko after the 2007 closings (GX CCRD 1 and 2). The jury reasonably concluded based on this evidence that Bartko participated in the scheme.

*Fifth*, O'Brien emphasizes that the government did not present evidence showing Bartko's involvement in the 2004 and 2006 transactions. As this Court explained in its duplicity ruling, Bartko did not need to know about the 2004 and 2006 transactions for them to be part of a single scheme. R. 116 at 11-12 (citing *United States v. Hollnagel*, 2011 WL 3664885, at *11 (N.D. Ill. Aug. 19, 2011) (rejecting argument that because the indictment did not allege that each defendant "participated in each of the misrepresentations and transactions, the [indictment] must allege separate schemes and therefore fails for duplicity," because in a scheme (unlike in a conspiracy), each participant "need not know about the existence and activities of the other co-schemers"); *Brown*, 894 F. Supp. at 1155 (scheme was "unified by the presence of the defendant Brown in each alleged act of fraud"; the fact "that many of the alleged co-schemers were unaware of the existence of a larger scheme" "is irrelevant to an allegation of a common scheme")). The jury did not need to conclude that Bartko participated in each transaction to find a scheme.

*Sixth*, O'Brien argues that the 2006 commercial line of credit transactions were dissimilar and disconnected from the 2004, 2005, and 2007 transactions. The Court explained in its duplicity ruling that if the line of credit was used to maintain or cover expenses for the investment properties, it was sufficiently related to be part of the scheme. R. 116 at 10-11. O'Brien acknowledges that the government introduced a summary chart and testimony by Special Agent Donald Kaiser supporting that at least two of the advances on the commercial line of credit were related to the properties: "a payment for the 46th Street property in the amount of $2,457.91 on January 5, 2007, and a mortgage payment for the 54th Street property in the amount of $1,689.96, also on January 5, 2007." R. 277 at 15 (citing GX Summary 5); Tr. 930. The government also introduced O'Brien's bank records reflecting advances on the 2006 loan, with a handwritten circle around numerous advances and with the following handwritten note appearing to be a description of all the circled advances: "823 W. 54th Street rehab – labor." GX O'Brien 39. A rational juror could conclude based on this evidence that the 2006 transactions were part of the scheme.

*Seventh*, O'Brien emphasizes that Citibank was not involved in the 2004, 2005, and 2006 transactions; it was involved only in 2007. But there is no requirement that the same victim be involved in all of the transactions in a scheme. To the contrary, as this Court explained in its duplicity ruling, courts have found

that schemes had an adequate nexus where they involved the same *class* of victims, as they did here (lenders). R. 116 at 9-10, 14 (collecting cases).[5]

*Eighth*, O'Brien argues that the 2007 transactions were nothing like the 2004, 2005, and 2006 transactions and so could not constitute part of the same scheme. According to O'Brien, nothing untoward happened in 2007. O'Brien emphasizes that according to the government's own witnesses, O'Brien did not have access to Kwan's 2007 loan packages, and Kwan's loans were originated by a company different than the company where O'Brien and Bartko worked together. R. 277 at 16. O'Brien therefore argues that "[t]here was zero evidence that Ms. O'Brien had anything to do with Kwan's loans." *Id.* O'Brien further claims there was no evidence that Kwan was a straw buyer and not a legitimate buyer.

These arguments ignore: (1) the HUD-1s for the purchases, which O'Brien signed and which identified Kwan as the buyer (GX 46th St. Sale 1; GX 54th St. Sale 1); (2) the acknowledgements signed by O'Brien, Bartko, and Kwan identifying Bartko as a buyer, contrary to the HUD-1s (Acknowledgment 1 & 2); (3) the checks

---

[5]  The Court disagrees with O'Brien that the government's references to a scheme to defraud "lenders" throughout the trial "treated lenders as the equivalents of financial institutions" and allowed the jury to convict based on "a scheme to defraud 'lenders.'" R. 288 at 12. The government accurately described the class of victims of the scheme it alleged as "lenders." And the jury instructions ensured that the jury specifically found: (1) that "[t]he scheme affected Citibank, N.A., *a financial institution*" for purposes of Count I; and (2) that O'Brien "knowingly executed the scheme" by causing "Citibank, N.A., *a financial institution*" to fund a loan for purposes of Count II. R. 229 at 21-22 (emphasis added). The same reasoning applies to O'Brien's complaints about the government's shorthand references to "Citi" or the "Citi entities" during trial. The instructions made clear when an element needed to be proven with respect to Citibank specifically, and O'Brien's counsel highlighted these points and the differences between Citibank and CitiMortgage throughout trial.

O'Brien wrote to Bartko on the day before the closing with the addresses of the two properties written on top, which were not disclosed in the HUD-1s (GX 46th St. Sale 17; GX 54th St. Sale 8); and (4) Kwan's quit claim deeds transferring the properties to Bartko shortly after closing (GX CCRD 1 and 2). Based on this evidence, the jury could have reasonably inferred that Kwan was a straw buyer and Bartko was the true buyer. It also could have reasonably inferred O'Brien's knowledge of the full scope of the transactions, especially based on her checks to Bartko. The fact that neither Bartko nor Kwan testified does not render the jury's reliance on this evidence mere speculation, as O'Brien argues. Documentary evidence is not inherently less valid than testimonial evidence.

O'Brien's final challenge to the scheme element really amounts to improper re-argument of the evidence related to the 2007 transactions in the light most favorable to O'Brien. This is improper. As explained above, "[s]orting the facts and inferences is a task for the jury," *Warren,* 593 F.3d at 547, and the Court may not "reassess the weight of the evidence" on a motion for judgment of acquittal. *Arthur,* 582 F.3d at 717.[6] The government presented sufficient evidence of a scheme to support O'Brien's convictions on both counts.

---

[6]     This same reasoning forecloses other points O'Brien makes about the 2007 evidence. She claims the checks from O'Brien to Bartko were not kickbacks, as the government characterized them during trial, because they were written on O'Brien's own account, "which is the antithesis of attempting to conceal payments." R. 277 at 17. O'Brien further argues that O'Brien may not have thought the checks needed to be disclosed on the HUD-1s because they were not deposited until after closing. *Id.* And she emphasizes that the acknowledgements were notarized at closing, meaning that Bartko's status as a buyer was disclosed. O'Brien made these arguments to the

### b.    Alleged Variance

O'Brien also says a material variance between the indictment allegations and the proof at trial related to the scheme element prejudiced her. Specifically, she maintains that the indictment alleged that O'Brien and Bartko engaged in a scheme to defraud that began in 2004 and continued until 2007, but the proof at trial established that Bartko was involved only between 2005 and 2007. R. 277 at 43.

A variance arises "when the facts proved at trial differ from those alleged in the indictment." *U.S. v. Scheuneman,* 712 F.3d 372, 378 (7th Cir. 2013). A variance constitutes error only if it "change[s] an essential or material element of the charge so as to cause prejudice to the defendant." *Id.* at 379. An essential or material element of the crime "is one whose specification with precise accuracy is necessary to establish the very illegality of the behavior and thus the court's jurisdiction." *United States v. Auerbach*, 913 F.2d 407, 411 (7th Cir. 1990).

O'Brien's variance argument fails on multiple grounds. For starters, it is questionable whether there was any variance between the indictment and the proof at trial. Although the indictment contains one sentence broadly characterizing the scheme as one "[b]eginning in or about 2004, and continuing at least in or about 2007" and involving "JESSICA ARONG O'BRIEN and MARIA BARTKO," the detailed allegations in the indictment allege Bartko's participation only in the 2005 and 2007 transactions. R. 1 ¶¶ 2, 4, 9, 15-22. The evidence at trial was consistent with those more detailed factual allegations, showing Bartko's involvement in the

jury, and the jury rejected them. This was not unreasonable. The Court may not reweigh the evidence.

14

2005 and 2007 transactions. *See* GX 46th St. Refinance 2; GX 54th St. Refinance 2; GX 45th St. Sale 17; GX 54th St. Sale 8; GX 54th St. Sale 9; Acknowledgments 1 and 2.

Moreover, even if there was a variance, the Seventh Circuit has rejected the argument that a variance as to the year the scheme began is material, so long as the evidence presented still establishes an illegal scheme. In *United States v. Andry*, 666 F. App'x 550 (7th Cir. 2016), the defendant argued that "there was a material variance" where "the indictment charged one scheme running from 2008 to 2012, but . . . the evidence at trial established multiple smaller schemes and that [defendant] was only involved in the scheme running from February 2010 to 2012." *Id.* at 552-53. The Court found this argument "foreclosed by [its] decision" in *United States v. White*, 737 F.3d 1121 (7th Cir. 2014), which held that "'it is permissible for the government to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged, so long as that subset is also illegal.'" *Andry*, 666 F. App'x at 552-53 (quoting *White*, 737 F.3d at 1138).

Here, like in *White*, any variance as to when Bartko's involvement in the scheme began was not material or prejudicial because the "subset of the allegations" proven would still be "illegal." 737 F.3d at 1138. As this Court explained above and in its duplicity ruling, Bartko did not need to be involved in the 2004 transactions for the scheme element to be satisfied. *See* R. 116 at 11-12.

### 2. Statute of Limitations For Count I: Effect On Financial Institution

#### a. Sufficiency Of The Evidence

O'Brien next argues that no rational jury could have found that the scheme affected a financial institution for purposes of Count I (mail fraud). Because the government relied on a ten-year statute of limitations to charge Count I when it did, the government had to establish that "the offense affect[ed] a financial institution." 18 U.S.C. § 3293(2). "Prior to 2009," when all the relevant events in this case took place, "the term 'financial institution' was defined to include insured depository institutions of the FDIC [Federal Deposit Insurance Corporation], but not mortgage lenders." *Bouchard*, 828 F.3d at 124 (citing 18 U.S.C. § 20 (2008)).

Pursuant to the pre-2009 definition of "financial institution," Citibank qualifies as a financial institution, but its loan servicing arm CitiMortgage, standing alone, does not. *See, e.g.*, Tr. 653-54. For this reason, the parties heavily contested Citibank's involvement in the 2007 transactions during pre-trial proceedings. If Citibank was not affected by the mail fraud charged in Count I, the default five-year statute of limitations would apply to that charge, and the statute of limitations would have expired well before the government indicted this case. *See* R. 201 at 3-4.

Based on evidentiary hearing testimony from Judy Taylor, a Citibank vice president, as well as supporting records documenting Citibank's funding of at least one of the 2007 loans (*see, e.g.*, R. 113 at 78-69, 105; R. 148-1, 148-2, 148-3, 148-4, 148-5, 148-6), the Court denied O'Brien's pre-trial motion to dismiss the indictment

16

based on the statute of limitations. R. 201. The Court allowed O'Brien to continue to pursue discovery from the Citi entities on this issue up until right before trial, when the Citi entities produced further documents corroborating Taylor's testimony. *See* R. 203-1.

At trial, the government introduced through Taylor a number of exhibits illustrating the flow of the money from Citibank to CitiMortgage, funding both a $292,000 mortgage loan and a $73,000 home equity loan on the 46th Street property as part of the 2007 sales. Tr. 667-79. Taylor testified that Citibank suffered actual losses on the 2007 loans. Tr. 677-79. At the conclusion of trial, the Court instructed the jury that it needed to find for purposes of Count I that "[t]he scheme affected Citibank, N.A., a financial institution." R. 229 at 21. It further instructed the jury that "[f]or purposes of Count One, a scheme affects a financial institution if it exposes the financial institution to a new or increased risk of loss. A financial institution need not have actually suffered a loss in order to have been affected by the scheme." *Id.* at 31.

In her motion for judgment of acquittal, O'Brien maintains that no rational juror could have found an effect on Citibank as required for the ten-year statute of limitations in 18 U.S.C. § 3293(2) to apply. The Court disagrees.

The Seventh Circuit in *United States v. Serpico*, 320 F.3d 691, 694-95 (7th Cir. 2003), interpreted the term "affects a financial institution" in 18 U.S.C. § 3293(2) broadly, and affirmed use of the same jury instruction the Court gave in this case. *Serpico*, 320 F.3d at 694-95 (approving an instruction stating that a

17

scheme affects a financial institution if it "exposed the financial institution[ ] to a new or increased risk of loss. A financial institution need not have actually suffered a loss in order to have been affected by the scheme."). Other circuits have likewise recognized the wide reach of 18 U.S.C. § 3293(2). The Third Circuit rejected the argument that "a fraud perpetrated against a financial institution's wholly owned subsidiary cannot affect the parent" under § 3293(2) as "a clearly untenable assumption." *United States v. Pelullo*, 964 F.2d 193, 215-16 (3d Cir. 1992); *accord United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (citing *Pelullo* to "easily reject" the argument that defrauding a financial institution's subsidiary was insufficient as a matter of law to meet the "affect[ing] a financial institution" requirement in § 3293(2)).

The evidence at trial plainly supported the jury's finding that the scheme affected Citibank for purposes of Count I. Taylor testified not only that Citibank incurred a risk of loss, but that the 2007 loans resulted in an actual loss to Citibank. And Taylor testified not only that CitiMortgage was involved in funding the loans as Citibank's "wholly owned subsidiary" (Tr. 741), but that Citibank was the actual lender on one of the loans, and the funds for both loans came directly from Citibank. Specifically, Taylor testified that: (1) Citibank was the lender on the $73,000 loan for the 46th Street sale (Tr. 643); (2) CitiMortgage was the lender on the $292,000 loan for the 46th Street sale, but the money for that $292,000 loan came from Citibank (Tr. 643, 656-60); (3) Citibank had to foreclose on the 46th Street property at a "significant loss" to Citibank (Tr. 677); and (4) the $73,000 loan

18

was a complete loss, and the proceeds from the foreclosure sale were insufficient to cover the remaining balance on the $292,000 loan (Tr. 677-79).

O'Brien claims that Taylor's testimony was inadmissible hearsay. It was not. Rather than offering out-of-court statements for their truth, Taylor testified about already admitted bank records based on her personal knowledge as a long-time Citibank employee.

O'Brien further argues that the bank records regarding the funding of the loans were "ridiculously confusing" because they "show hundreds of millions of dollars of transfers, thru all sorts of channels." R. 277 at 21 n.13. But Taylor walked the jury through these documents in her testimony, identifying the relevant parts for the jury. She explained that on the day of closing, the funds went from (a) a Citibank Treasury account (namely, "Citibank N.A. for USCGB Treasury"[7]) to (b) a CitiMortgage account to (c) another CitiMortgage account (a CitiMortgage Wholesale account) to (d) the settlement agent/title company. Tr. 658-60, 667-74. The same process took place for both the $292,000 loan and the $73,000 loan. Tr. 660.

O'Brien says this case is like *United States v. Irvin*, 682 F.3d 1254 (10th Cir. 2012), where the Tenth Circuit, in the course of upholding a conviction on a bank fraud count, explained in dicta that defendant "appear[ed]" to be "correct" that a

---

[7]     O'Brien points out that Taylor did not know specifically what the acronym "USCGB" stands for, and guessed it was "U.S. Consumer Banking Group Treasury." Tr. 740. But Taylor's uncertainty about this acronym is beside the point. She testified unequivocally that the money came from a Citibank account, which is supported by the fact that the account has "Citibank, N.A." in the name—*i.e.*, "Citibank N.A. for USCGB Treasury."

mortgage loan was never owned by a parent financial institution, and instead "was strictly the property of" the mortgage corporation subsidiary. *Id.* at 1272. But in *Irvin*, the mortgage company subsidiary drew on a line of credit made available by the parent, bundled loans "into mortgage-backed securities within thirty to forty-five days of their origination," sold the loans "to investment banks on the secondary market," and then used the proceeds to repay its debts to the parent. *Id.* The parent "played no role" in the process. *Id.* Here, by contrast, the evidence supported direct involvement by Citibank, including supplying the funds on the day of the closing and taking the actual losses on the 46th Street loans in 2007.[8] In any event, *Irvin* addressed the bank fraud statute under 18 U.S.C. § 1344, not the level of proof required to show an effect on a financial institution for purposes of the ten-year statute of limitations for mail or wire fraud.

Finally, O'Brien argues there was no evidence that O'Brien knew her conduct affected a financial institution. But for purposes of Count I, the government did not need to prove that O'Brien knew her scheme affected a financial institution. In *United States v. Marr*, 760 F.3d 733 (7th Cir. 2014), the Seventh Circuit "join[ed] the reasoning of [its] sister circuits" in holding that the wire and mail fraud statutes

---

[8] This evidence also distinguishes this case from *United States v. Bennett*, 621 F.3d 1131 (9th Cir. 2010), another case cited by O'Brien. In *Bennett*, there was no evidence that the parent company owned or controlled the subsidiary's loan assets, and the Ninth Circuit explained that "a parent corporation does not own the assets of its wholly-owned subsidiary by virtue of that relationship alone." *Id.* at 1136-38. Here, the government did not rely on the subsidiary-parent relationship alone to prove that Citibank owned the assets—it introduced Taylor's testimony and documents supporting that the funding for the 2007 loans in fact came from the parent Citibank.

"only require[ ] the government to prove that a defendant intended for his or her scheme to defraud *someone*, a financial institution does not need to be the intended victim." *Id.* at 743-44.[9] As such, the *Marr* court explained that "the government needed only to prove that Marr's scheme to defraud affected Palos Bank, not that Marr intended to defraud Palos Bank." *Id.* at 744. The "'object of the fraud is not an element of the offense.'" *Id.* (quoting *Pelullo*, 964 F.2d at 216). Nor does 18 U.S.C. § 3293(2), the ten-year statute of limitations for wire and mail fraud affecting a financial institution, refer to knowledge or in any way add an element requiring the defendant to know that a financial institution is affected. The evidence was more than sufficient for the jury to find an effect on a financial institution satisfying § 3293(2).

### b.  Alleged Vagueness

O'Brien also makes a vagueness challenge to the "affect[ing] a financial institution" language in § 3293(2). The Fifth Amendment's due process clause "gives rise to the general rule that prohibits the government from imposing sanctions under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *United States v. Coscia*, 866 F.3d 782, 791 (7th Cir. 2017), *reh'g and suggestion for reh'g en banc denied* (Sept. 5, 2017), *cert. denied*, 138 S. Ct. 1989 (2018). "To satisfy

---

[9]     Although the *Marr* court addressed the wire fraud statute, 18 U.S.C. § 1343, its holding applies equally to the mail fraud statute at issue in Count I, 18 U.S.C. § 1341. *See, e.g.*, *United States v. White*, 737 F.3d 1121, 1130 n.4 (7th Cir. 2013) ("cases construing the mail fraud statute (18 U.S.C. § 1341) are applicable to the wire fraud statute (18 U.S.C. § 1343)," and vice versa).

21

due process, a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. Unites States*, 561 U.S. 358, 402-03 (2010).

Notably, O'Brien does not point to any case addressing or sustaining a vagueness challenge to the "affects" provision in § 3293(2). And courts including the Seventh Circuit have had little trouble interpreting the word "affects" in the statute. *See Serpico*, 320 F.3d at 694 (conduct "affects" a financial institution if it exposes that institution to an "increased risk of loss"); *see also, e.g.*, *United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010) ("While Congress certainly could have extended the limitations period only when wire fraud 'causes a loss' to a financial institution, it chose instead to use the considerably broader term "affects.' And that means simply to 'make a material impression on; to act upon, influence, move, touch or have an effect on,' I Oxford English Dictionary 211 (2d ed. 1989), or perhaps more appositely to this case, 'to have a detrimental influence on,' Webster's Third New International Dictionary 35 (2002).").

The cases on which O'Brien relies in support of her argument do not find or suggest that the word "affects" in § 3293(2) is unconstitutionally vague. To the contrary, they interpret the word "affects" and set limits on its boundaries. *See United States v. Agne*, 214 F.3d 47, 52 (1st Cir. 2000) (explaining that there was no evidence of even a risk of loss to a financial institution in that case, and "at minimum there needs to be some impact on the financial institution to support a

conviction"); *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000) (explaining in a case where the government conceded lack of effect on a financial institution that "a wire fraud offense under section 1343 'affected' a financial institution only if the institution itself were victimized by the fraud, as opposed to the scheme's mere utilization of the financial institution in the transfer of funds").

In any event, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). As the discussion above shows, the evidence at trial supported a finding by the jury not just of a risk of loss to Citibank or an effect on Citibank through its mortgage servicing arm CitiMortgage, but an actual loss to Citibank specifically. O'Brien's conduct thus clearly fell within the boundaries proscribed by courts for "affect[ing]" a financial institution, and her vagueness challenge necessarily fails.

### 3. Count II: Sufficiency Of The Evidence

O'Brien next claims the jury had insufficient evidence to convict her on Count II. Count II charged O'Brien with both sections of the bank fraud statute. That statute provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, or securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

> shall be fined not more than $1,000,000 or imprisoned not more than
> 30 years, or both.

18 U.S.C. § 1344. The Seventh Circuit has confirmed that both sections of § 1344 may be charged in a single count, and it has explained that "proof of any one of those acts conjunctively charged may support a conviction." *United States v. LeDonne*, 21 F.3d 1418, 1427 (7th Cir. 1994).

### a. Intent

O'Brien first claims lack of proof of intent. As the Supreme Court held in *Loughrin v. United States*, 134 S. Ct. 2384 (2014), proof of specific intent to defraud a financial institution is not required under § 1344(2), but it is required under § 1344(1). *Id.* at 2387-90. For this reason, O'Brien's threshold argument that she should be acquitted on Count II because "no rational jury could find that Ms. O'Brien specifically intended to defraud Citibank, N.A" (R. 277 at 27) is misplaced. The jury rationally could convict O'Brien under § 1344(2) without finding specific intent to defraud.

O'Brien claims that because Bartko and Kwan did not testify and because O'Brien did not sign the HUD-1 or the note for the $73,000 loan naming Citibank as the lender, there was insufficient evidence for the jury to find the requisite intent under either § 1344(1) or § 1344(2). The Court disagrees. A rational jury could have convicted O'Brien of bank fraud in Count II based under either prong of § 1344.

**Section 1344(2).** For purposes of § 1344(2), the government needed to prove a scheme to defraud with intent to obtain property owned by, or in the custody or control of, a financial institution by means of false or fraudulent pretenses,

24

representations, or promises—it did not need to find specific intent to defraud a financial institution. *Loughrin*, 134 S. Ct. at 2389. A reasonable jury could have inferred O'Brien's intent to obtain property owned by or in the control of a financial institution based on evidence regarding the $73,000 loan naming Citibank (undisputedly a financial institution) as the lender. Although O'Brien did not sign the HUD-1 or the note for the $73,000 loan (GX 46th St. Sale 2; GX 46th St. Sale 7) and Kwan and Bartko did not testify, a reasonable jury could have inferred O'Brien's knowledge of that loan and its funding based on the documentary evidence. The HUD-1 that O'Brien *did* sign, for the $292,000 loan, also listed the $73,000 loan. GX 46th St. Sale 1. The loans closed on the same day, had the same closer, and O'Brien was present as the seller. Additionally, according to the HUD-1s, O'Brien acted as the seller's attorney for both the 46th and 54th Street sales and prepared corresponding closing statements. GX O'Brien 8 and 9.

O'Brien emphasizes that testimony supported that O'Brien would not have seen Kwan's loan documents themselves. Tr. 587, 732. But O'Brien's status as the seller's attorney and her signature on the HUD-1 listing the $73,000 loan, along with the acknowledgments and checks suggesting that O'Brien knew that Bartko was a buyer and paid Bartko money to buy the properties, allowed the jury to draw the inference that O'Brien had intimate knowledge of the 2007 transactions' nature, including the funding of the $73,000 loan by Citibank. Such an inference would support a finding that O'Brien intended to obtain property owned by or in the custody or control of Citibank.

25

The jury also could have found that O'Brien had intended to obtain property owned by or in the custody or control of Citibank based on the evidence regarding the $292,000 loan. It is true that the HUD-1 for the $292,000 loan identified CitiMortgage—not Citibank—as the lender (GX 46th St. Sale 1); the title commitment form said the same (Defense Exhibit 70). But Taylor testified that Citibank ultimately funded this loan. Tr. 643, 656-60, 677. The jury could have inferred O'Brien's familiarity with Citibank and CitiMortgage as its loan servicing arm based on the ample evidence at trial regarding O'Brien's background as a licensed loan originator, a licensed real estate broker, the owner of a licensed real estate company, and a licensed attorney. And the evidence showed that O'Brien had significant prior experience with Citibank in particular. Taylor testified that Citibank purchased O'Brien's loan on the 46th Street property as a successor lender and required O'Brien to sign an updated Uniform Residential Loan Application when it did. *See* GX 46th St. Purchase 1-10; Tr. 705-23. All of this evidence would have allowed a reasonable juror to infer that O'Brien understood that the fraudulently-obtained funds used to fund the $292,000 loan ultimately were owned by or in the custody or control of Citibank, and that she intended to obtain those funds.

O'Brien relies on the Second Circuit's decision in *Bouchard*, 828 F.3d 116, in support of her argument that the evidence was insufficient for the jury to infer that O'Brien intended to obtain Citibank property. In *Bouchard*, the Second Circuit found a lack of evidence satisfying § 1344(2) where the evidence showed that the

defendant knew about the mortgage company's involvement, but not about the parent bank's involvement, and the offenses occurred before the 2009 amendments to the definition of "financial institution" to include mortgage companies. 828 F.3d at 126-27. But as the *Bouchard* court explained, "the Government might have been able to prove that Bouchard knew that money from mortgage lenders came from banks by virtue of his knowledge of the industry." *Id.* at 127. In that case, the government presented no such proof. *Id.* Additionally, *Bouchard* involved entities without an obvious corporate relationship: a mortgage broker named BNC that was owned by Lehman Brothers, a financial institution. *Id.* at 120.

Here, unlike in *Bouchard*, the government presented evidence of and emphasized throughout trial O'Brien's considerable knowledge of the industry. And this case involves entities with an obvious corporate relationship: Citibank and CitiMortgage.

The Eleventh Circuit recently distinguished *Bouchard* and affirmed a conviction under § 1344(2) in a case similar to this one. *See United States v. Rabuffo*, 716 F. App'x 888 (11th Cir. 2017). In *Rabuffo*, the defendant was charged under both clauses of § 1344, and the evidence at trial showed that the fraud scheme was aimed at SunTrust Mortgage. *Id.* at 897. Like here and in *Bouchard*, the loans in *Rabuffo* occurred before Congress amended the bank fraud statute to specify that the mortgage companies qualified as "financial institutions." *Id.* The Eleventh Circuit found the evidence sufficient to support the conviction where, like here but unlike in *Bouchard*, the evidence supported that the defendant was

"experienced" in the real estate industry. *Id.* at 898. The court explained that "defendant's experience, involvement in the scheme, and interactions with SunTrust Bank presented sufficient evidence that he was aware that the scheme would affect SunTrust." *Id.* at 899. Moreover, because "the name[ ] of the wholly-owned subsidiar[y] at issue [SunTrust Mortgage] w[as] substantially similar to the[ ] parent financial institution [SunTrust Bank]," it was "reasonable to infer . . . that the [d]efendant[ ] w[as] aware that the fraudulently obtained funds were owned or were under the custody or control of the parent financial institution[ ]." *Id.*

Like in *Rabuffo*, a rational jury could have inferred based on O'Brien's involvement in the scheme, her industry knowledge, her experience with Citibank specifically, and the similarity in the Citibank and CitiMortgage names, that O'Brien knew that the funds for either the $73,000 loan, the $292,000 loan, or both, were owned by or in the custody or control of the parent financial institution Citibank. A rational jury therefore could have found the requisite intent by O'Brien to obtain that property under § 1344(2) through her involvement in the 2007 loans.

**Section 1344(1).** A rational jury also could have found that O'Brien had the requisite specific intent to defraud a financial institution required under § 1344(1). *See Loughrin*, 134 S. Ct. at 2387-90. "The 'scheme to defraud' clause of Section 1344(1) is to be interpreted broadly." *United States v. Brandon*, 298 F.3d 307, 311 (4th Cir. 2002). Evidence that the defendant intentionally exposed a financial institution to a risk of loss is "one way of establishing intent to defraud" a financial

institution for purposes of § 1344(1). *United States v. Hoglund*, 178 F.3d 410, 413 (6th Cir. 1999).

The same reasoning described above with respect to § 1344(2) could have led a reasonable jury to make the further inference that O'Brien specifically intended to expose a financial institution (Citibank) to a risk of loss under § 1344(1). The government's basic proof on both §§ 1344(1) and (2) was the same. *See also Loughrin*, 134 S. Ct. at 2390 n.4 ("the overlap between the two clauses [of Section 1344] is substantial").

Specifically, based on O'Brien's signature on the HUD-1 for the $292,000 loan disclosing the $73,000 loan and her close involvement in the transaction as seller and seller's attorney, the jury could infer that she knew Citibank was the lender on the $73,000 loan and specifically intended to expose Citibank to a risk of loss. Or, based on O'Brien's signature on the HUD-1 for the $292,000 loan, the jury could infer that O'Brien specifically intended to expose CitiMortgage to a risk of loss. And based on the evidence of O'Brien's knowledge of the industry and prior experience with Citibank, combined with the similarity in the names of Citibank and CitiMortgage, the jury could have inferred that O'Brien also specifically intended to expose Citibank to a risk of loss through that transaction. *See, e.g.*, *United States v. Edelkind*, 467 F.3d 791, 797-98 (1st Cir. 2006) (§ 1344(1) applied to a scheme where the defendant fraudulently obtained a loan from an uninsured subsidiary of an insured bank in an "integrated transaction" where the bank was to purchase the

loan after its issuance, even if the defendant did not know about the arrangement for the later purchase of the loan).

O'Brien again points to *Bouchard*, where the Second Circuit found insufficient evidence under § 1344(1) because the fraud was directed at BNC, a wholly owned subsidiary of Lehman Brothers. 828 F.3d at 124-26. The Second Circuit explained that "a defendant cannot be convicted of violating § 1344(1) merely because he intends to defraud an entity, like BNC, that is not covered by the statute." *Id.* at 125. But in *Bouchard*, the government "concede[d] there was no evidence that [the defendant] specifically intended to defraud Lehman Brothers" or was aware of its role. *Id.* at 124. Here, by contrast, the evidence described above could have supported the inference that O'Brien knew about Citibank's role and thus specifically intended to cause a risk of loss to Citibank.

### b. Causation of Execution

Relatedly, O'Brien argues there was insufficient evidence for a rational jury to find that O'Brien caused Citibank to fund the $73,000 loan. The Court instructed the jury that it had to find, for purposes of Count II, that O'Brien "on or about April 16, 2007, caus[ed] Citibank, N.A., a financial institution, to fund a mortgage loan in the amount of approximately $73,000 for the purchase of the 625 West 46th Street, Chicago, Illinois." R. 229 at 22. O'Brien says the fact that O'Brien did not sign the HUD-1 for the $73,000 loan means there was a failure of proof on this issue. As O'Brien acknowledges, however, "[t]he HUD-1 that Ms. O'Brien and Kwan *both* signed included *both* loan amounts of $292,000 and $73,000." R. 277 at 35

(emphasis in original). And Taylor testified that Citibank in fact funded the $73,000 loan as part of the 2007 purchase of the 46th Street property. Thus, there was sufficient evidence for the jury to infer that O'Brien's sale of her 46th Street property caused Citibank to fund the $73,000 loan.

## II.     Motion for a New Trial

### A.     Standard

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Eberhart,* 388 F.3d 1043, 1048 (7th Cir. 2004), *overruled on other grounds,* 546 U.S. 12 (2005). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *Id.* The court may grant a new trial if the jury's "verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington,* 184 F.3d 653, 657 (7th Cir. 1999). Put another way, "[t]he court should grant a motion for a new trial only if the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan,* 486 F.3d 260, 266 (7th Cir. 2007). "In order to receive a new trial based on erroneous instructions, a defendant must show both that the instruction did not adequately state the law and that the error was prejudicial to

31

[her] because the jury was likely to be confused or misled." *United States v. White,* 443 F.3d 582, 587 (7th Cir. 2006).

## B. Application[10]

O'Brien makes four basic arguments in her motion for a new trial. First, O'Brien says the instructions allowed the jury to convict her based on conduct outside the statute of limitations. Second, O'Brien maintains that all of the evidence regarding the 2004, 2005, and 2006 transactions was inadmissible propensity evidence under Federal Rule of Evidence 404(b). Third, O'Brien challenges the pattern instructions the Court gave with respect to the intent element of Count II. And fourth, O'Brien challenges the Court's decision to admit the quit claim deeds transferring the investment properties from Kwan to Bartko shortly after the 2007 closings.

### 1. Statute Of Limitations And Scheme

O'Brien's motion for a new trial begins with a convoluted argument that primarily pertains to Count II (bank fraud). O'Brien focuses on the fact that bank fraud is complete upon each execution and is not a continuing offense. *E.g.*, *United States v. Anderson*, 188 F.3d 886, 888 (7th Cir. 1999). She notes that any pre-2007 executions of bank fraud were therefore "completed offenses long before the [2007] sales." R. 277 at 46. She then emphasizes that the Court instructed the jury that it had to find at least one "materially false or fraudulent pretense, representation, or

---

[10]    In addition to the specific grounds on which she moves for a new trial, O'Brien asks to preserve her pre-trial motions to dismiss the indictment denied by the Court (R. 45; R. 131; R. 139; R. 141; R. 214). R. 277 at 44. Those motions are preserved.

promise" charged in the indictment to convict her of bank fraud (and mail fraud as well), but that it did not need to find all of them. R. 229 at 21-22, 25, 32. O'Brien explains that the jury therefore could have convicted her of bank fraud by finding that she made a false statement in a 2004, 2005, or 2006 execution of bank fraud, and not necessarily the 2007 execution of bank fraud. O'Brien maintains that "the jury [instead] should have been instructed that it had to find a materially false or fraudulent pretense, representation, or promise occurred after April 11, 2007." R. 288 at 31. Otherwise, she says, "the indictment and instructions allowed Ms. O'Brien to be convicted for conduct that was barred by the statute of limitations." R. 277 at 51.

This argument can be broken down into several parts. First, there is the legal question of what conduct must fall within a statute of limitations in order to bring an entire scheme within the statute of limitations, and in particular a bank fraud scheme for which each execution is a complete crime. The Seventh Circuit answered this question in *United States v. Longfellow*, 43 F.3d 318, 319-25 (7th Cir. 1994), a case addressing an indictment charging multiple executions of bank fraud as part of a single scheme. The defendant in *Longfellow* made a series of improper loans to individuals so they could purchase the defendant's land. *Id.* at 319. Although all of the original loans occurred more than five years before the defendant was indicted, outside the limitations period, the defendant refinanced one of the loans within the limitations period, and the government charged that refinancing as an execution of the defendant's scheme to defraud. *Id.* at 322. The Seventh Circuit held that the

33

charging of one execution within the statute of limitations brings the entire scheme within the statute of limitations. *Id.* at 322-24. The fact that "only one or two executions fell within the Statute of Limitations," did "not detract from the entire pattern of loans[ ] being a scheme, and render[ed defendant] no less culpable for that entire scheme." *Id.* at 322-25.[11]

The Seventh Circuit did not find it to be a problem in *Longfellow* that prior, complete executions of bank fraud outside the statute of limitations were charged as part of a single scheme. And for good reason. As the Court explained in its duplicity ruling, "'an act which *can* be viewed as an independent execution of a scheme' and thus charged as a separate count," as each execution of bank fraud could be, "does not *need* to be charged in a separate count." R. 116 at 5 (quoting *United States v. King*, 200 F.3d 1207, 1213 (9th Cir. 1999)); *see also United States v. Hammen*, 977 F.2d 379, 383 (7th Cir. 1992) (in the context of mail and bank fraud, explaining that although "for each count of conviction, there must be an execution," "the law does not require the converse: each execution need not give rise to a charge in the

---

[11]     O'Brien's attempts to distinguish *Longfellow* are misplaced. She says *Longfellow* involved the "same victim" "suffering through a unitary, continuing course of conduct," and this case did not. R. 288 at 30. But this Court already has explained above and in its duplicity ruling why the various transactions did not need to involve the same victim to be part of a single scheme. O'Brien further emphasizes that *Longfellow* explained that the execution falling within the statute of limitations had to be "a separate act that created a new risk" for the bank. 43 F.3d at 325. She says the 2004, 2005, and 2006 transactions did not place Citibank at a new risk of loss because they involved different lenders. But as *Longfellow* shows, what matters is that the execution falling within the statute of limitations was a separate act exposing Citibank to a new risk of loss. And again, Taylor's testimony supported that the 2007 executions not only placed Citibank at a risk of loss but caused Citibank to suffer an actual loss.

indictment"). In other words, "[i]f several fraudulent executions are part of the same scheme, the government . . . has discretion to (a) charge each execution in a separate count or (b) 'allege only one execution of an ongoing scheme that was executed numerous times.'" R. 116 at 5 (quoting *Hammen*, 977 F.2d at 383). Thus, as this Court concluded in its duplicity ruling, the government properly charged only one "execution" of the scheme in each of Counts I and II—the 2007 executions with respect to the 46th Street loans. *Id.* at 4-6 (citing R. 1 at 9, 10). And the fact that these executions fell within the statute of limitations brings the entire scheme within the statute of limitations. *Id.*

O'Brien's reliance on *Anderson*, 188 F.3d 886, and *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 2009), in support of her contrary argument is misplaced. In *Anderson*, the Seventh Circuit reversed a bank fraud conviction because the entire fraud was complete prior to the expiration of the statute of limitations; no "execution" occurred within the statute of limitations. 188 F.3d at 891. In *Yashar*, the Seventh Circuit explained that for a non-continuing offense, the limitations period begins to run when all elements of the offense are established; "if all elements of the crime were met" prior to the statute of limitations cut off, then the indictment would not be timely, but if "a necessary element of the offense" took place within the limitations period, the indictment would be timely. 166 F.3d at 878-80. Here, the indictment charged an execution of bank fraud—*i.e.*, a necessary element of the bank fraud scheme charged—within the statute of limitations.

35

The second question embedded in O'Brien's argument is whether the jury instructions accurately reflected the law just recited and ensured that the jury convicted O'Brien based on an execution falling within the statute of limitations. They did.

To ensure that the jury convicted O'Brien based on the 2007 executions falling within the statute of limitations, the Court added the execution language from the indictment to the pattern elements instructions for mail and bank fraud. *See* R. 229 at 21 (instructing the jury on Count I that it had to find that "for the purpose of carrying out the scheme or attempting to do so, the defendant caused the use of a commercial interstate carrier in the manner charged in Count One, specifically, on or about April 16, 2007, caused to be deposited, to be sent and delivered by commercial interstate carrier, an envelope containing a payoff check relating to the purchase of the property located at 625 West 46th Street, Chicago, Illinois"); R. 229 at 22 (instructing the jury on Count II that it had to find "[t]he defendant knowingly executed the scheme by, on or about April 16, 2007 causing Citibank, N.A., a financial institution, to fund a mortgage loan in the amount of approximately $73,000 for the purchase of 625 West 46th Street, Chicago, Illinois"). These instructions made sure that the jury did *not* convict O'Brien based on 2004, 2005, or 2006 executions of the alleged scheme, and therefore addressed her statute of limitations concerns. *See Sorich v. United States,* 709 F.3d 670, 677 (7th Cir. 2013) ("we presume that a jury follows its instructions").

The third question embedded in O'Brien's argument is whether the Court properly instructed the jury with respect to the bank fraud count under 18 U.S.C. § 1344 that:

> For purposes of Count Two . . . [i]n considering whether the government has proven a scheme to obtain moneys, funds, assets, or other property from a financial institution by means of false pretenses, representations, promises, or concealment of material facts, the government must prove at least one of the false pretenses, representations, promises, or concealment of material facts charged in the portion of the indictment describing the scheme beyond a reasonable doubt. However, the government is not required to prove all of them.

R. 229 at 32. This instruction is based verbatim on the Seventh Circuit's pattern instruction for "18 U.S.C. § 1344 – Multiple False Statements Charged" (except that the Court added the words "beyond a reasonable doubt" at O'Brien's request). *See* Seventh Circuit Pattern Criminal Jury Instructions (2012), p. 414. The Seventh Circuit "presume[s] that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law." *Marr*, 760 F.3d at 744. And O'Brien has not cited any case supporting that this is an incorrect statement of the law. In other words, as long as the jury found a scheme and an execution of that scheme within the statute of limitations, it needed to find only one of the false statements charged as part of the scheme beyond a reasonable doubt. It did not need to find a false statement with respect to the execution falling within the statute of limitations specifically.

In sum, the entire bank fraud scheme in Count II (and the mail fraud scheme in Count I) fell within the statute of limitations as long as the jury found a scheme

and an execution of the scheme within the statute of limitations. The jury instructions ensured that it did. And the Court properly instructed the jury, pursuant to the Seventh Circuit's pattern instruction, that it had to find only one false representation or promise alleged in the scheme beyond a reasonable doubt— not all of them and not any one of them in particular.

### 2. Rule 404(b) Evidence

O'Brien further argues that all of the evidence offered related to the 2004, 2005, and 2006 transactions was inadmissible propensity evidence under Federal Rule of Evidence 404(b). But as the Seventh Circuit explained in *United States v. Ferrell*, 816 F.3d 433 (7th Cir. 2015), "Rule 404(b) does not apply to direct evidence of the crime charged." *Id.* at 443 (citing *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010) ("[I]f the evidence is admitted as direct evidence of the charged offense, Rule 404(b) is not applicable. Specifically, evidence directly pertaining to the defendant's role in a charged conspiracy is not excluded by Rule 404(b).").

Here, evidence of the 2004, 2005, and 2006 transactions was not other acts evidence for purposes of Fed. R. Evid. 404(b). It was evidence of charged crimes— namely, evidence of the 2004, 2005, and 2006 transactions that the Court has already found were properly included as part of the scheme to defraud. There was therefore no need for the Court to undertake a Rule 404(b) analysis.

O'Brien says she was "prejudice[d]" by the fact that the Court never had to undertake a Rule 404(b) analysis. R. 288 at 32. She made the same argument in her duplicity motion to dismiss. *See* R. 116 at 22 (O'Brien argued that "the indictment

38

prejudices her by allowing time-barred evidence to be admitted as probative of a scheme that this Court otherwise may not admit under . . . [Rule 404(b)]"). And this Court found that it was within the government's discretion to proceed the way it did. *Id.* at 3-23. The Court noted that other courts have admitted evidence of transactions outside the statute of limitations as scheme evidence. R. 116 at 22-23 (citing *United States v. Grossi*, 1995 WL 571417, at *4 (N.D. Ill. Sept. 25, 1995; *Hollnagel*, 2011 WL 3664885, at *12). A case on which O'Brien relies, *United States v. Wellman*, 830 F.2d 1453 (7th Cir. 1987), likewise explained that conduct outside the statute of limitations "was highly relevant to the existence of the very same scheme to defraud which the mailings in this case were alleged to have furthered." *Id*. at 1464. The *Wellman* court alternatively explained that the evidence went to the issue of intent, meaning that it would have been properly admitted under Rule 404(b) in any event. *Id.* The Court makes the same alternative finding here.

### 3. Intent Instructions for Count II

O'Brien next objects to the intent component of the Court's elements instruction on Count II for bank fraud. That instruction told the jury, in relevant part, that it had to find:

> 1. There was a scheme to defraud a financial institution or to obtain moneys and property owned by, or in the custody or control of, a financial institution by means of false or fraudulent pretenses, representations or promises as charged in Count Two of the indictment; and . . .
>
> 3. The defendant acted with the intent to defraud; . . .

R. 229 at 22. That instruction, including the intent element, was based verbatim on the Seventh Circuit pattern elements instruction for bank fraud under 18 U.S.C. § 1344. Seventh Circuit Pattern Criminal Jury Instructions (2012), p. 411 ("18 U.S.C. § 1344 Financial Institution Fraud – Elements"). Again, the Seventh Circuit "presume[s] that the Pattern Criminal Jury Instructions for the Seventh Circuit correctly state the law." *Marr*, 760 F.3d at 744.

O'Brien argues that the intent instruction did not properly account for *Loughrin*'s holding that the intent requirement is different under § 1344(1) than under § 1344(2)—*i.e.*, § 1344(1) requires specific intent to defraud a financial institution, but § 1344(2) does not. 134 S. Ct. 2384. The Court disagrees.

Jury instructions are reviewed "as a whole to determine whether they fairly and accurately summarize the law." *United States v. Grady*, 746 F.3d 846, 848 (7th Cir. 2014). And here, the combination of several intent-related instructions given by the Court on Count II—*i.e.*, the Seventh Circuit pattern elements instruction for bank fraud under 18 U.S.C. § 1344, combined with the Seventh Circuit pattern instruction for the "Scheme – Definition" under 18 U.S.C. § 1344—fairly and accurately summarized the law.

Although part 3 of the elements instruction described the third element of bank fraud more generally as "the defendant acted with the intent to defraud," part 1 told the jury that it had to find "a scheme to defraud a financial institution [*i.e.*, the language of § 1344(1)] *or* to obtain moneys and property owned by, or in the custody or control of, a financial institution by means of false or fraudulent

40

pretenses, representations or promises [*i.e.*, the language of § 1344(2)]. R. 229 at 22 (emphasis added). And the "Scheme – Definition" instruction defined "scheme to defraud a financial institution" (*i.e.*, for purposes of § 1344(1)) with the requisite element of specific intent:

> For purposes of Count Two, . . . A scheme to defraud a financial institution means a plan or course of action intended to deceive or cheat that financial institution or to obtain money or property or to cause the potential loss of money or property by the financial institution.

*Id.* at 32; *see* Seventh Circuit Pattern Criminal Jury Instructions (2012), p. 413 ("18 U.S.C. § 1344 Scheme – Definition). The Committee Comment for this instruction explains that this paragraph "should be given in a case in which a scheme to defraud a bank [under § 1344(1)] is charged." *Id.* (committee comment). The "Scheme – Definition" instruction thus ensured that if the jury found a "scheme to defraud a financial institution" as required for § 1344(1), it also had to find the requisite specific intent.[12]

O'Brien notes that, based on *Loughrin*, the Seventh Circuit has proposed— but not yet adopted—new, separate bank fraud instructions for §§ 1344(1) and (2). *See* Proposed Revisions to Seventh Circuit Criminal Jury Instructions ("18 U.S.C. § 1344(1) Scheme to Defraud A Financial Institution – Elements"; "18 U.S.C. § 1344(1) Scheme to Defraud – Definition"; "18 U.S.C. § 1344(2) Obtaining Bank Property By False Or Fraudulent Pretenses – Elements"; "18 U.S.C. § 1344(2)

---

[12]     O'Brien says the jury could have potentially disregarded everything prior to the "disjunctive 'or'" in this instruction and therefore not found the requisite intent. R. 288 at 34. But the Court presumes that the jury follows the plain language of jury instructions. *See Sorich,* 709 F.3d at 677.

41

Scheme to Defraud – Definition") (*available at* http://www.ca7.uscourts.gov/pattern-jury instructions/2016_proposed_changes_to _CrimCivil_Jury_Instructions.pdf). But as the Committee Comment explains, these separate instructions are designed to account for *Lougrin*'s "h[olding] that *the Government need not prove* that a defendant charged under 18 U.S.C. § 1344(2) intended to defraud the bank or financial institution." *Id.* ("18 U.S.C. § 1344(1) Scheme to Defraud A Financial Institution – Elements," committee comment) (emphasis added). It is for this reason that "the Committee has divided the previous unified instruction for § 1344 into two separate instructions." *Id.* In other words, the Committee has proposed revising the pattern instructions to make the government's *lesser* burden of proof under § 1344(2) clear.

The proposed revisions include a "18 U.S.C. § 1344(1) Scheme to Defraud – Definition" instruction regarding intent that is identical to the instruction the Court gave, proscribing the requisite specific intent for "a scheme to defraud a financial institution" under § 1344(1). *Id.* ("18 U.S.C. § 1344(1) Scheme to Defraud – Definition"). Although the proposed pattern instructions separating out § 1344(1) and § 1344(2) may be clearer, they in no way support that the current, pattern instructions the Court gave misstated the law. If anything, the current instructions might have prejudiced the government, because the proposed separate instructions make clear that specific intent is *not* required under § 1344(2). In any event, the pattern instructions given did not prejudice O'Brien. *See White,* 443 F.3d at 587 (new trial appropriate only when instructions caused prejudice).

Finally, O'Brien takes issue with the government's statement to the jury at closing that the third element of bank fraud was "I think . . . identical" to the intent element of mail fraud, Tr. 1195, without clarifying the different intent levels required under § 1344(1) and § 1344(2). The government immediately thereafter emphasized that it was speaking in general terms. Tr. 1195 (clarifying that the intent and other elements of mail fraud "are generally consistent with Count II"). And the government's main point in this discussion was that its "proof [wa]s the same" and "overlap[ping]" on this and certain other elements of Counts I and II, so it planned "to discuss them together." *Id.* The government later clarified that "[t]he defendant acted with intent to defraud if the defendant acts knowingly and with *intent* to deceive or cheat *the victim* in order to cause a gain or money or property to the defendant." Tr. 1197 (emphasis added). Read in context, the government's discussion of intent in its closing statement did not prejudicially mislead the jury.

### 4. Admission Of Quit Claim Deeds

Finally, O'Brien claims the Court erred in admitting into evidence the quit claim deeds transferring the properties from Kwan to Bartko shortly after the 2007 closings (GX CCRD 1 and 2). O'Brien argues that the deeds were hearsay, lacked foundation without a witness's testimony introducing them, and were irrelevant because there was no evidence O'Brien knew about them. The Court disagrees.

The deeds were not hearsay or offered without foundation. Deeds are "[s]tatements in documents affecting an interest in property" that "fall within an exception to the hearsay rule." *Doss v. Clearwater Title Co.*, 551 F.3d 634, 640 (7th

43

Cir. 2008) (citing Fed. R. Civ. 803(15)). And the government obtained certified copies of the deeds from the Cook County Recorder of Deeds Office, which are self-authenticating. *See* Fed. R. Evid. 902 (certified copies of public records are self-authenticating; a witness is not needed).

And the deeds were relevant regardless of whether O'Brien knew about them. The indictment alleged, and the government offered proof at trial, that Bartko was the true buyer of O'Brien's properties in 2007, and Kwan was merely a straw buyer. The quit claim deeds supported this position by showing that the properties were deeded over from Kwan to Bartko very soon after the closings.

Finally, O'Brien says that because the Court admitted the quit claim deeds, O'Brien should have been allowed to introduce evidence that Kwan quit-claimed a property in Skokie to Bartko on another occasion. O'Brien sought to introduce this evidence to support an argument that Kwan and Bartko were involved in their own separate scheme. Unlike the quit claim deeds that the Court admitted, which pertained directly to the properties at issue, the quit claim deed O'Brien sought to introduce involved a different property not at issue in this case. It was therefore properly excluded as irrelevant.

## Conclusion

For the foregoing reasons, the Court denies O'Brien's post-trial motions for a judgment of acquittal or, alternatively, for a new trial [277]. For the same reasons it denies her post-trial motion for a judgment for acquittal, the Court also denies O'Brien's motion for judgment of acquittal filed at the close of the government's case

[225], as well as O'Brien's oral motions for a directed verdict at the close of the evidence and following the jury charge, which the Court took under advisement (*see* R. 230).

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: September 4, 2018