## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 CR 239 |
| v. | ) | |
| | ) | |
| JESSICA ARONG O'BRIEN, | ) | Hon. Thomas M. Durkin, |
| | ) | *Judge Presiding.* |
| Defendant. | ) | |

## DEFENDANT JESSICA ARONG O'BRIEN'S SENTENCING MEMORANDUM

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a), as well as the Sixth Amendment of the United States Constitution and the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220 (2005), Defendant Jessica Arong O'Brien (Jessica) respectfully requests a below-guideline sentence. Such a sentence will be sufficient, but not greater than necessary to achieve the sentencing goals enumerated in 18 U.S.C. § 3553(a)(2). It will likewise be consistent with the limitations of 18 U.S.C. § 3582(a).

## I. INTRODUCTION

Before this Court is a 51-year-old wife, mother, and attorney who has dedicated her life to community service. Professionally, she rose as far as she could—a judge. Now, she has fallen as far as she can—a felon. She has lost her career, her reputation, her purposefulness, and possibly, soon, her family life and freedom.

Jessica emigrated from the Philippines to the United States as a young woman. Before then, she was raised by her grandmother, and a "village" of community members and extended family. Here, she completed college and law school, raised three daughters, and succeeded in a variety of career-related endeavors. A devout Catholic, she attends daily services and volunteers to support the Church's activities. With her family and through her faith, she now gets through her days.

## II.    THE STATUTORY FACTORS

Section 3553(a) of Title 18 of the U.S. Code obligates this Court to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing set forth by Congress. 18 U.S.C. § 3553(a). Those include:

- To provide just punishment, to reflect the seriousness of the offense, and to promote respect for the law;

- To create adequate deterrence;

- To protect the public; and

- To provide the defendant with necessary treatment or training.

18 U.S.C. § 3553(a)(2)(A)-(D). Accordingly, to fashion a sentence that complies with the above goals, 18 U.S.C. § 3553(a) directs this Court to consider the following factors:

- The nature and circumstances of the offense, as well as the history and characteristics of the defendant;

- The kinds of sentences available;

2

- The sentencing guideline range;

- Sentencing Commission policy statements; and

- The need to avoid unwarranted sentencing disparities among defendants with similar records who engaged in similar conduct.

18 U.S.C. § 3553(a)(1); 18 U.S.C. § 3553(a)(3)-(6).

Importantly, the guidelines are now only one of numerous factors the court must consider when imposing a sentence. *See United States v. Booker*, 543 U.S. 220, 259 (2005) (citing § 3553(a) for the proposition that the Sentencing Reform Act "requires judges to take account of the Guidelines together with other sentencing goals.").

The Seventh Circuit has recognized that the sentencing judge "cannot treat all sentences that would fall within the guidelines sentencing range as reasonable *per se*." *United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005). While the guidelines remain a factor, this Court ought not to presume that they will produce the "correct" sentence. *See United States v. Demarree*, 459 F.3d 791, 794-95 (7th Cir. 2006). Accordingly, this Court should impose a sentence below the advisory guideline range when that sentence conforms to the § 3553 factors, as in this case.

In determining how to sentence the defendant, the Court must now consider the person; Your Honor is no longer required to simply follow a chart.

A.   **SECTION 3553(a)(1): THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Section 3553(a)(1) appropriately counsels that the offending conduct should be considered in conjunction with the particular history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).[1]  One must view the defendant's role in the offense and try to understand them as a person, evaluating their criminal conduct vis-à-vis how they have otherwise lived their life.

Jessica has committed much of her adult life to serving others.  From the time she entered law school in 1995, she devoted herself to being a leader in the advancement of women and minorities.  She has received recognition from dozens of organizations and professional groups for her contributions.  Her efforts included the establishment of diversity scholarship opportunities, improved accessibility to the legal system, associational leadership, and exceptional service in the judiciary.

Over the years, Jessica has served as co-chair for the Alliance of Bar Associations for Judicial Screening; mentor for the Chicago Bar Association's Abraham Lincoln Marovitz Lend-a-Hand program; member of the Magistrate Judge Merit Court Selection Panel for the United States District Court for the Northern District of Illinois; as a commissioner for the Illinois Supreme Court's Character & Fitness Committee; and as a Hearing Officer and Member of its Oversight

---

[1] This Court presided over the trial in this case, and therefore, it is familiar with the conduct.  Thus, it will not be addressed here.  Of note is the FBI agent Kaiser's recognition that there was no evidence of recruitment by Ms. O'Brien of Christopher Kwan or Maria Bartko at the time Bartko and Kwan were purchasing the properties for investment.  PSR ¶ 18.  Also of note is that both Kwan and Bartko had every intention to pay both loans.  The eventual foreclosures were the result of the recession, not a pre-determined plan.

Committee for the Attorney Registration Disciplinary Commission. She has received numerous awards for her service on and off of the bench, including the Illinois Secretary of State's Judge Laura C. Trailblazer Award; the Chicago Bar Association's Distinguished Service Award and its prestigious Vanguard Award; and the President Barack Obama Volunteer Service Award. *See* Exhibit A, List of Professional and Community Achievements, for a detailed history of her community involvement.

In 2016 before she learned about the government's investigation of her, in collaboration with an ABC Network producer/director, Jessica began working on an inspirational documentary project as an extension of her column "Making It," which was a featured column in the Chicago Daily Law Bulletin. The project—entitled "The Pursuit of Excellence"—was aimed to cover working professionals and their real-life journeys to success. The project was also intended to feature individuals whose careers and success were jeopardized as a result of substance abuse, addiction, and mental health issues. She began the project to inspire people to reach their highest potential and to shed light on others' struggles with adversity. *See* Ex. A.

Jessica's commitment to service is deeply rooted in her Catholic faith. She began volunteering in the Catholic Church while growing up in the Philippines and throughout her life here in the United States, while she lived in New Jersey, Boston, and here in Chicago. After completing her undergraduate degree, she taught children about faith through the church's catechism program. When she

relocated to the Chicago area for law school, Jessica continued to volunteer with the church as a lector at Holy Name Cathedral, and helped fundraise to relocate Chicago's oldest Catholic Church from Van Buren to a Michigan Avenue location.

Her faith has also helped her to cope with the stress this case has caused for her and her family. Jessica currently serves as a volunteer lector, acolyte, and eucharistic minister at St. Peter's Church. In addition, she serves as a lector for Friday evening services at St. Stanislaus Kostkas in Chicago and during weekends at Holy Name Cathedral.

In 2017, Jessica joined the Secular Order of Discalced Carmelites (OCDS) headquartered in Glenview, Illinois. She has since been vested with the first-year, brown Scapular habit, signifying the start of her formal formation to OCDS. Jessica has also completed a faith-based lifestyle program called, "33 Days to Morning Glory" that encourages participants to emulate different saints (for example, Mother Teresa and Pope John Paul II) and their devotion to Jesus Christ. She has since helped a group of Filipino congregants in their completion of the same program.

Now a naturalized citizen, *see* PSR ¶ 54, Jessica (née Vasquez Arong) was born in Cebu City in the central region of the Philippines on September 6, 1967, to Pedro Rosales Arong, Jr. and Asuncion Taboada Vasquez. PSR ¶ 48. She was one of two children born to her parents; her sister Joanna Vasquez Arong, age 48, works as a documentary producer in the Philippines. *Id.* As a child, Jessica's parents

were largely absent from her life.[2]  Growing up, she barely knew her mother, who had left the Philippines when Jessica was young to pursue a medical residency in New York City.  *See* PSR ¶ 50.  Her father was a businessman who traveled extensively for work; he eventually raised another family while she was living in the Philippines and favored his second wife and Jessica's half-siblings.[3]  *Id.*  With both parents unable to care for her, Jessica primarily was raised by her paternal grandmother and other members of the community who ensured that she was well-educated, that she had a strong Roman Catholic religious foundation, and that she had proper guidance.  *See id.*  Jessica lived in a home as a child with extended family members.  Before turning 10 years of age, she was molested by one of her cousins who lived in the same house for about a year.  Scared and blaming herself for her cousin's behavior, Jessica turned to her faith until that cousin moved out.

It was not until Jessica was 15 that her mother invited her to visit in the United States for the first time.  *Id.* ¶ 51.

Her mother remarried twice once in the United States, having settled in New Jersey.  *Id.*  Though the visit allowed her to reconnect with her mother and experience a new culture, Jessica's first trip to the United States was not entirely pleasant.  *See id.*  Jessica's stepfather—her mother's second husband, also a

---

[2] Her parents' marriage was annulled at some unknown point; divorce does not exist in the Philippines.  PSR ¶ 48.
[3] Jessica has two paternal half-sisters in their 40s: Irish Arong, a single mother who resides in the Philippines, and Debbie Eibbed, who resides in Jordan.  She does not maintain regular contact with them.  PSR ¶ 49.

physician—molested her multiple times during her summer-long stay with them. *Id.* Afraid, she never reported what was happening. *Id.*

The following year, after completing high school, Jessica and some of her relatives immigrated to the United States. *Id.* ¶ 52. She resided with her mother and stepfather at their home in New Jersey. Jessica had her own phone line. *Id.* Her stepfather again began making inappropriate advances towards her, including sexually explicit phone calls to her private phone line. *Id.* She started recording the phone calls. The next time he harassed her, she told him of the recordings, threatening to play the taped conversations for her mother if his behavior continued. *Id.* Her threat worked, and her stepfather never again touched her. *Id.* Jessica kept her word and never disclosed the incidents to her mother. But, she did tell a former boyfriend who informed Jessica's mother about the stepfather's inappropriate behavior. *Id.* Jessica's mother reacted with disbelief, and the subject was buried. *Id.* Still, while the physical abuse stopped, her stepfather began to verbally abuse Jessica. *Id.*

Jessica attended Rowan College (formerly Burlington Community College) where she was initially placed in a remedial program for a year. In 1987, she earned an associate's degree in applied science. *Id.* ¶ 69. She then moved to Boston, Massachusetts, where she earned her bachelor's degree in hotel/food administration, with a minor in finance, from Boston University. *Id.* From 1989 to 1995, she worked as a lounge host (entry level management position), and then, after she attended the Le Cordon Bleu culinary and hospitality program in London,

England as a supervisor and food and beverage trainer at Caesar's Palace Hotel and Casino in Atlantic City, New Jersey, *Id.* As a trainer to close to a thousand employees, Jessica often provided support for casino waitresses and other support staff members who were battling alcohol and drug addictions.

In 1995, Jessica moved to Chicago to study law at The John Marshall Law School. *See* PSR ¶¶ 55, 70. She graduated in 1998 with both a juris doctor and LL.M. degree in taxation, earning her license to practice the same year. *Id.* ¶¶ 70, 74. In 2002, she earned a second LL.M. degree in employee benefits. *See id.* ¶¶ 70, 74. Then, in 2003, Jessica obtained her license as a real estate agent and broker while she was on maternity leave with her second daughter. *Id.* ¶ 71. Thereafter, she worked part time as a real estate broker, until she became a judge. *Id.*

Between 2000 and 2012, Jessica was a special assistant attorney general for the Illinois Department of Revenue (IDOR) where she was responsible for cases related to income, sales, and property taxes. *Id.* ¶ 75. From 2011 to mid-2012, Jessica served in dual positions as special assistant attorney general and as acting chief counsel for the Illinois Lottery, helping the Lottery agency when their attorney resigned.

In 2012, Jessica was elected to a judgeship for the Cook County Circuit Court. She was first assigned to traffic court and small claims court, presiding over bench trials. *Id.* ¶ 74. In 2016, she was assigned to a jury room, where she worked until being placed on administrative leave.

Throughout the pendency of this case, Jessica has leaned heavily on her family. She met her husband of 15 years—Cook County Circuit Court Judge Brendan A. O'Brien—while attending law school at John Marshall. *Id.* ¶ 55. She became pregnant with their first child during her second year of law school; they married several years later. *Id.* Jessica and her husband have three children: Samantha Theresa O'Brien, age 21, who attends college at the University of San Diego in California; J. R. O., age 14; and V. K. O., age 11. *Id.* Jessica's husband describes her as "an excellent mother" to their children, *id.* ¶ 58, with whom she is very close, *id.* ¶ 55. He and Jessica's oldest daughter have remained supportive of her during the pendency of this case.

The younger children were largely unaware of the details until this September. After her post-trial motions were denied, Jessica and her husband sat down the two girls and informed them of what has happened. The girls understandably were devastated. The youngest daughter, Vanessa, was inconsolable, unable to return to school the following day. True to her faith, Jessica refocused her children's attention to praying more and to continue loving, praising and thanking God, notwithstanding these trials and tribulations. *Id.* ¶ 56.

In addition to her immediate family, Jessica remains close with her parents and sister, Joanna. *Id.* ¶ 48. Her mother still resides in New Jersey, but flew to Chicago to provide support to Jessica and attend parts of her trial. *Id.* Her father eventually moved to the United States and temporarily lived with Jessica and her family in their home, assisting her and her husband with childcare. *Id.* He is now

mostly retired and resides in Cicero, Illinois. *Id.* Before charges in this case were filed, Jessica paid her father's rent every month and helped him with his needs.

The dire consequences of this case, the jury's verdict and this court order have deeply affected Jessica in the most profound ways, which she regrets daily. She grieves over how everything that is happening will leave a stigma on her children for the rest of their lives. She wrestles every single day with what has happened, and how deeply it has affected her life, and the lives of those she loves.

## B. 3553(a)(4): THE SENTENCING GUIDELINE RANGE

The first step in sentencing a defendant is to correctly calculate the applicable guideline range. *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 169 L.Ed. 2d 445 (2007); *United States v. Vrdolyak*, 593 F.3rd 676, 678 (7th Cir. 2010). Notably, after doing so, the court is entitled to disagree with the results of the guideline calculation and even categorically reject the Sentencing Commission's policy choices. *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840, 843-44, 172 L.Ed. 2d 596 (2009); *United States v. Aguilar-Huerta*, 576 F. 3d 365, 446-67 (7th Cir.), cert. denied, 130 S. Ct. 811, 175 L.Ed. 2d 596 (2009).

Jessica has the following corrections and objections to the PSR:

(1) Paragraph 38: Jessica objects to any reference to "another loan," which is unidentified and for which no evidence exists.

(2)     <u>Paragraph 48</u>:  Jessica maintains regular contact with her father.  He used to live with her and her family, but he eventually moved to Cicero, Illinois. Jessica paid for her father's monthly rent before charges were brought in this case.

(3)     <u>Paragraph 50</u>: When Jessica was in grade school, her mother came to the United States to complete a medical residency in Bronx, New York.  After completing her residency, she practiced as an obstetrician-gynecologist.  Her mother first remarried Andre Ciceron, a urologist.  They settled in Mt. Laurel, New Jersey, moving to Linwood, New Jersey, in the late 1980s.  After they divorced, her mother married Edwin Ouano, while Jessica was in law school.

(4)     <u>Paragraph 52</u>:  When Jessica moved to the United States in 1984, her mother constructed a new addition to her home on the first floor (not the basement). The remaining bedrooms were on the second floor of the home.

(5)     <u>Paragraph 55</u>:  Jessica worked at Caesar's Palace in Atlantic City, New Jersey—not Las Vegas, Nevada—from 1989 to 1995.

(6)     <u>Paragraph 74</u>:  Jessica was assigned in the First Municipal District to traffic court for a period of three months, then to a small claims court, presiding over bench trials.  In late 2016, Jessica was assigned to a jury room where she worked until she was placed on administrative leave—she was never assigned in Chancery.

(7)     <u>Paragraph 75</u>:  Jessica held dual positions as a special assistant attorney general and acting general counsel for the Illinois Lottery.

(8)  <u>Paragraph 77</u>:  Jessica's net monthly income reflects as less than her husband's due to insurance for their children and other elective deductions.

(9)  <u>Paragraph 78</u>:  Jessica's husband has always paid the mortgage, real estate taxes and monthly association assessments on their residence, with the exception of the line of credit that was taken out to pay, among other things, for her legal defense; Jessica is paying on the line of credit.  Both child care and school expenses are shared between Jessica and her husband.   The same was true when they lived at 971 S. Park Terrace, Chicago, IL 60605 throughout their ownership of that home.

(10)  <u>Paragraph 81</u>:  While Jessica cannot object to the calculated total amount of restitution owed, it is important to remember that unlike in many mortgage frauds, this was not a flip to benefit the seller, with the intent that the buyer was going to abandon the property.  Based on the FBI reports, the buyers, Kwan and Ms. Bartko, had every intention of renting out the property and paying their loans.  The fact that they stopped after the market crashed almost a year later was not within Jessica's contemplation nor her control.

**C.**  <u>Paragraph 96</u>:  See paragraph 95.


**D.  3553(a)(5): THE KINDS OF SENTENCES AVAILABLE**

District courts are to fashion a sentence sufficient but not greater than necessary to achieve the sentencing goals.  18 U.S.C. § 3553(a); *see Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840 (2009).  Here, the purposes of sentencing can be

achieved through a below-guideline sentence. The phrase "sufficient but not greater than necessary" is not hollow; it means that the sentence need not be any longer than is minimally appropriate under the circumstances.

In the case at bar, Jessica has already been punished. This is conduct that occurred a decade or more before she was charged. When charged, her exemplary civic involvement and devotion to charitable causes came to a halt. Although she was presumed innocent, she was shunned. In her community, around the neighborhood and her children's school, she was treated as a pariah, as if she had already been convicted and as though her misstep had just occurred. She has lost the respect of her peers, her judgeship, her law license, and her years of education are now for naught.

Any sentence of incarceration would, at this point, be pure retribution. The appropriate sentence—one that is sufficient but not greater than necessary, taking into account all of the sentencing factors—is no further incarceration beyond the social and professional exile she must now endure.

Jessica's fall from success has been sudden and extreme. She has been shamed and humiliated, shunned, and isolated. Her lifetime of devotion to community and to the legal profession is in shambles. Jessica will no longer be remembered or even appreciated for the tireless hours devoted to helping others. The loss of the comradery of colleagues and the friendship of others has been a lonely struggle.

Likewise, the impact on her family cannot be overstated. This case has understandably taken an incredible toll on each of them. Her daughters, once so proud of their mother, are humiliated and ashamed. As teenagers, they have the intellectual capacity to understand but not the emotional capacity to cope. The fear and uncertainty of losing their mother, for an indeterminate period of time, is devastating for these young ladies. Her husband—also a judge—has similarly struggled. Colleagues and friends, once warm and friendly, have shied away. The stress of the case and the hours Jessica have spent distracted from her family have left him to often assume the difficult tasks of parenting alone.

### E.    3553(a)(6): THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

Section 3553(a)(6) requires that the Court consider "the need to avoid unwarranted sentencing disparities among defendants with similar records that have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Supreme Court has made it clear that a sentencing court can look at a co-defendant's sentence in conducting its disparity analysis. *Gall v. United States*, 528 U.S. 38 (2007).

The co-defendant, Maria Bartko, pled guilty to Count One of the indictment; her sentencing is pending. Bartko's conduct in this case was more severe. She bought two other properties before she purchased the properties from Jessica and was under investigation for both health care and immigration fraud when she decided to cooperate. Even before moving to Illinois, public record shows that Ms.

15

Bartko had already been involved in another foreclosure proceedings in Ohio with her former husband. She is the typical "flipper" who called Jessica out of the blue while cooperating with the FBI. It is understandable that the government did not want to introduce the recorded conversations between Jessica and Ms. Bartko because Jessica told Ms. Bartko to tell the truth.

After moving to Illinois, Ms. Bartko admitted to committing marriage fraud, marrying her second husband for financial benefit. During the government's investigation, Ms. Bartko gave inconsistent statements regarding her work for a medical doctor, the money she received from this doctor and her relationship with this doctor. During her plea, Ms. Bartko explained to this court what she did wrong which initially did not include any mention of Jessica until after her lawyer halted her testimony before this court and after consulting with her lawyer, she then testified, "And Jessica knew about it too." There is no comparison between these co-defendants. Jessica consistently has given back to her community well before and well after the transactions at issue here. Thus, imposition of a sentence that would be compared to Ms. Bartko's sentence would not create a just result.

## III.    <u>CONCLUSION</u>

Jessica has already lost everything she has worked so hard for: her career, her reputation, her social network, and her standing in the community.  She has spent many sleepless nights in the quiet sanctuary of the church, contemplating an uncertain and drastically altered future.  Her family has also endured the emotional stress of supporting her through this ordeal and coming to terms with the possibility of losing her as a wife and mother for an unknown period of time. Despite Jessica's many years of dedicated service to others, she faces the lonely proposition of rebuilding her life.  As this Court contemplates the appropriate sentence, Jessica's good deeds, contributions, and the losses she has already sustained should be given due consideration.

Respectfully submitted,

*/s/ Steven A. Greenberg*
*Attorney for Defendant*

STEVEN A. GREENBERG
Greenberg Trial Lawyers
53 W. Jackson Blvd., Ste. 1260
Chicago, IL 60604
(312) 879-9500
Steve@GreenbergCD.com